**[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 95.]**

THE STATE OF OHIO, APPELLEE, *v*. JOHNSON, APPELLANT.

[Cite as *State v. Johnson*, 2000-Ohio-276.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-1333—Submitted November 2, 1999—Decided March 1, 2000.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B-9708745.

————————————

{¶ 1} This case concerns offenses committed by appellant, Rayshawn Johnson, against two individuals. The offenses were charged in the same indictment and consolidated for purposes of trial.

{¶ 2} In June 1997, Nicole Sroufe moved into the Colony of Springdale apartment complex. During the July 4 weekend, appellant and his girlfriend moved into the complex. The patios of the apartments were located about ten to fifteen feet apart. The first time that Sroufe noticed appellant was after she had been awakened by the sound of a dog crying. From her living room, she could see that appellant had a puppy suspended by the collar with one hand and was beating it with his other hand, and yelling at it. Sroufe also saw appellant when she would walk to her car in the morning to go to work and he would be letting his dogs outside.

{¶ 3} On September 8, 1997, around 9:45 a.m., Sroufe left her apartment and walked to the parking area of the complex. When she was almost to her car, she heard rapid approaching footsteps behind her. Sroufe glanced around and saw appellant coming toward her. He grabbed her from behind. He put one hand over her mouth, his other hand around her waist, and told her, "C'mon, you're coming with me. We're going back inside. Let's go." Appellant then started to drag her backwards. Sroufe was able to struggle free. Appellant asked Sroufe for money and he told her that he had been fighting with his girlfriend and needed money to

get out of town. Sroufe said that she did not have any money, and she also mentioned that she was a social worker and worked in the justice system. At that point, appellant started to apologize, and he had asked her to keep this incident between them. He also asked Sroufe whether she could come over that night and help with his girlfriend. He said that he was "tripping," did not know what he was doing, and asked her forgiveness.

{¶ 4} Sroufe immediately drove to the rental office and reported the incident. She went to the police station, filed a report, and went to work. During the day, she periodically checked with the police to see if appellant had been apprehended. By 5:00 p.m. he had not been arrested; Sroufe then contacted a friend to meet with her and go to her (Sroufe's) apartment.

{¶ 5} Shortly after arriving at her apartment, Sroufe saw appellant and his girlfriend enter their apartment. Sroufe then contacted the police. The police arrived and knocked on the door to appellant's apartment. Abby Glenn, appellant's girlfriend, answered the door and told them that appellant was not there and that she was not going to let them in. The police were eventually allowed to enter the apartment and they found appellant in a closet in a rear bedroom hiding under some boxes. Appellant was removed from the closet and arrested.

{¶ 6} After being advised of his *Miranda* rights, appellant told police that he had asked Sroufe for money, but he denied touching her. He attempted to explain markings on her neck as self-inflicted. He was later released on bond.

{¶ 7} Following this incident, appellant and Glenn moved into his grandmother's house located on Fairfield Avenue in East Walnut Hills. The garage to the house was contiguous to the back yard of property owned by Shanon and Norman Marks. The Markses' home was located on Dexter Avenue. A privacy fence separated the yards. From an upper floor window in the Fairfield Avenue house, one could see into the Markses' yard and house, including the bathroom on the second floor of the Markses' home.

{¶ 8} On Wednesday, November 12, 1997, Norman Marks awoke at 5:45 a.m., showered, shaved, dressed, and prepared for his work day. He woke Shanon around 6:50 a.m. before he left for work. Shanon's routine in the morning was to shower, put on her robe, wrap a towel around her hair, and put on her makeup. When Norman left that morning, he did not lock the back door or set the house alarm. Norman and Shanon would usually call each other during the day. Around noon, Norman left a voice mail message with Shanon at her workplace, but he did not talk with her that day.

{¶ 9} Norman stated that they would routinely withdraw $200 on the weekend and that Shanon would take $50 for her weekly expenses. On the Sunday before November 12, 1997, Shanon told him that she still had $50 and did not need money for the week.

{¶ 10} Norman was not expecting Shanon home from work on November 12 until around 8:00 p.m. When he arrived home at approximately that time, he noticed that her car was already parked in the driveway. The door to the house was unlocked and the lights were off in the kitchen. He entered the living room, turned on the television, at which time he heard that the upstairs television was also on.

{¶ 11} Norman went upstairs and saw Shanon lying facedown in the bathroom. He tried to "wake her up" and "get her to react," but she did not respond. He then went into the bedroom and dialed 911. He noticed the contents of Shanon's purse strewn on the bed. He carried the phone into the bathroom and dialed for help. Shanon was cold and hard to the touch. The 911 operator told him to calm down and attempt CPR.

{¶ 12} Within a short time, firemen arrived at the Markses' home. Fireman Marty Overmeyer was met at the door by Norman, who was extremely distraught. Norman had blood on his shirt and face. He kept saying that his wife was dead. Overmeyer went up to the bathroom and saw Shanon on the floor. Overmeyer determined that she was dead and he instructed the rest of the firemen not to touch

anything.

{¶ 13} Criminalist Selma West was called to the scene. She found several identifiable prints in the home that were matched to the Markses'. She also examined the contents of Shanon's purse. There was some change on the bed, but no dollar bills. There were no identifiable fingerprints on the purse or its contents. The next day, a shoe print was lifted from the bathroom doorway area and from a railroad tie in the Markses' backyard.

{¶ 14} An autopsy performed on Shanon indicated that she had defensive wounds to her left forearm, some knuckles, and fingers. Her forearm had been broken and the knuckles and fingers had scrapes and bruises. She also had massive head injuries, consistent with being hit multiple times in the head with a ball bat. The coroner indicated that someone would have had to swing a ball bat as hard as he could to have caused the injuries. Shanon died of lacerations to the brain caused by blunt impacts to her head.

{¶ 15} On November 13, 1997, the police began a canvass of the neighborhood. Several neighbors said that they had neither seen nor heard anything. During the course of the day, local television stations aired interviews with appellant. He told the media about hearing his dog bark on the morning of the murder and how fearful he was that something like that had occurred in his neighborhood.

{¶ 16} Police obtained appellant's name from the media and went to the house on Fairfield Avenue to interview him. Appellant and his girlfriend resided on the third floor of the home. Appellant took Officer Greg Ventre up to the third-floor landing of the house and explained to Ventre that from a window he had watched police take pictures in the bathroom of the Markses' home. He then took Ventre to his third-floor bedroom. Appellant told Ventre that on the morning of the murder he had heard his dog barking. Next to the shoes appellant stated that he had worn on November 12 was a pair of Nike Air Jordans. Ventre looked at the

bottom of the shoes. He noticed that the pattern on the bottom of the shoes resembled the shoe print taken earlier from the railroad tie. As Ventre and appellant left his bedroom, appellant told Ventre that he was familiar with the inside of the Markses' home, since he and his brother had helped the previous residents remodel it. Appellant also knew that the house had an alarm system.

{¶ 17} During the canvass of the neighborhood, Ventre had stopped an African-American male, approximately ten years old, who said that he saw a man in the neighborhood, around 10:15 a.m. on November 12, known as "Dante." When Ventre asked appellant if he knew a man named Dante, he said that he did not.

{¶ 18} Subsequently, Ventre went to Cohen Sportswear to obtain a pair of Air Jordans in order to make a comparison between them and the shoes owned by appellant. He learned that a new Air Jordan shoe was issued every year and that the latest model was sold for the first time on November 1, 1997. The bottoms of Air Jordan shoes are patented. Also that same day, Ventre received a call from Nicole Sroufe. She had seen the media reports of the murder. She related her altercation with appellant and expressed her concern that he was out on bond. At that point, appellant became a suspect in the murder of Shanon.

{¶ 19} Thereafter, Abby Glenn, appellant's brother Ronnie Johnson, and appellant went to the police station for questioning. At the station, appellant signed a *Miranda* rights form and the police questioned him. Appellant recounted his whereabouts on the morning of the murder. His statement was then compared to that of his brother and girlfriend for discrepancies.

{¶ 20} Appellant talked with police and taped statements were made. Appellant confessed to killing Shanon. He described what had occurred on that day and the events leading up to the murder.

{¶ 21} In his initial taped statement to police, appellant stated that he woke up around 6:00 a.m. and dressed, putting on his Air Jordans. Appellant then went down to the basement, grabbed a ball bat, which he stuffed under his jacket, and

left the basement. Appellant also put on gloves. He went into the garage, closed the door, crawled through the back window, and dropped over a fence into the Markses' back yard. He then entered the back door of the Markses' house. Appellant stated that the door was open and "[i]f it wasn't opened, I was gonna do it to somebody else, I guess." While inside, he walked through the kitchen and up a staircase, which led to the bathroom where Shanon was located. At the time, Shanon was looking out the bathroom window. Appellant stated that he hit her two times in the back of the head and shoulder area, that she fell to the floor, and that he hit her one more time. Appellant told the police that he could not remember whether he hit her more than three times. He then entered a nearby bedroom, found Shanon's purse on a bed, and, according to appellant, he emptied the contents "to make it look like a robbery." As he was leaving, appellant heard Shanon crying for help.

{¶ 22} When he was in his garage, he took off his gloves and wrapped them in newspaper. He threw the gloves in the garbage, which was due to be picked up later that day. He took the bat and broke it with a brick. According to appellant, he then borrowed a car from a friend named Dante and took the bat to Eden Park and threw it away. He returned to the house on Fairfield Avenue, changed his clothes, and left for the day. Appellant stated that he did not know why he murdered Shanon. He said that he was not in his right mind at the time, that he had smoked some "weed" that morning, and that he felt stressed and was just feeling crazy.

{¶ 23} Approximately forty minutes later, on a second tape, appellant told police that he thought he had seen Shanon leave the house jogging. According to appellant, he then grabbed a bat and went into the Markses' house to get money so that he could move out of his grandmother's house because she had been pressuring him to leave. Prior to making this statement, appellant acknowledged that this taped statement was a followup or continuation of the first taped statement, and that he was fully aware and understood his *Miranda* rights.

**{¶ 24}** After appellant made these statements, he was arrested. Later that day, appellant called his house. Glenn, his brother, and his grandmother were all on the phone line. Glenn asked appellant if he had committed this crime, and he said "yes."

**{¶ 25}** The Air Jordans were seized from appellant's bedroom. Criminalist Mike Trimpe compared the Air Jordans to the shoe print taken from the bathroom and the railroad tie. The prints were consistent with each other, but he could not state with certainty that the shoe had made the print.

**{¶ 26}** When the police were unable to find the bat, they questioned appellant again. He told police that he had further information that he had neglected to provide to them earlier. Appellant was again given his *Miranda* rights and he also signed another waiver form.

**{¶ 27}** In this statement, appellant stated that on the day before the murder he was at his mother's house with his girlfriend, his son, and two other males. His mother made a call for him so that he and another individual could get some marijuana. After picking up the marijuana, they saw Dante driving a Cadillac. According to appellant, he knew Dante from school and they agreed to meet the next day around 7:00 a.m.

**{¶ 28}** Appellant told the police that on November 12 he went down to the basement to wash some clothes. He never washed any clothes, but while he was in the basement he picked up a bat. Appellant stated that he then met Dante, they got into Dante's car, Dante melted something onto some marijuana, and they drove around and smoked it. According to appellant, he thought that he saw Shanon jogging and he asked Dante if he wanted to go into her house to get some money. Dante offered to let him sell drugs if he needed money, but appellant said no. Appellant stated that they agreed to enter the house and that Dante entered the home through the front and he entered through the back.

**{¶ 29}** Appellant told police that they both went up the steps in the Markses'

home and that he (appellant) noticed a lady standing in the bathroom. According to appellant, he hit Shanon three times in the neck area and she fell to the ground. Appellant stated that he ran out of the bathroom and yelled, "Dante, I hit the lady," and that Dante asked appellant if she was dead. According to appellant, after he told Dante that Shanon was not dead, he (appellant) went into the bedroom and emptied the contents of her purse on the bed and Dante went into the bathroom and began hitting Shanon across the face with a gun. Appellant stated that Dante told him that she was not dead and that he (Dante) hit her to make sure that she could not identify them.

{¶ 30} Appellant also stated that he then returned to his house, acted like everything was normal, went out to walk the dog, broke the bat with a brick from the neighbor's yard, put the broken bat in his coat, and met Dante. Appellant told the police that he gave Dante $10 to let him drive and that they drove to Eden Park to get rid of the bat. Appellant stated that he then went home and got his dog and brought it into the house to make it appear as if he had just returned from walking it. Appellant ended the statement by describing how he was messed up and needed to see a psychiatrist because he was having weird experiences.

{¶ 31} During the canvass of the neighborhood, the police had also heard the name Dante, so they thought that there might be another suspect. Since appellant had connected Dante to his mother, they went to her apartment. She told police that she had never heard of anyone by that name. Later, the police received a call from a man who stated that he was Dante Williams. This person told them that the "Dante" they were looking for lived on Fairfield Avenue. Police investigated the matter, but were unable to locate any person by the name of Dante Williams.

{¶ 32} Appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Shanon. Count One of the indictment charged that appellant purposely, and with prior calculation and design, caused the death of Shanon in

violation of R.C. 2903.01(A). Count Two of the indictment charged appellant with the purposeful killing of Shanon during the commission of an aggravated burglary and/or robbery in violation of R.C. 2903.01(B). These counts each carried two R.C. 2929.04(A)(7) death penalty specifications, alleging that the murder was committed during the course of an aggravated burglary and aggravated robbery and that appellant was the principal offender or that he committed the offense with prior calculation and design. Appellant was also indicted, in Counts Three and Four, for the aggravated burglary and aggravated robbery of Shanon. In addition, with respect to the offenses committed against Sroufe, appellant was indicted on one count of kidnapping and one count of robbery.

{¶ 33} Prior to trial, the state dismissed Count One of the indictment and the specifications thereto. The remaining counts were then renumbered accordingly.

{¶ 34} Appellant was tried before a jury. The jury found appellant guilty of all charges and specifications. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for the aggravated murder of Shanon. The trial court accepted the jury's recommendation and imposed the sentence of death. In addition, the trial court sentenced appellant for the aggravated burglary and aggravated robbery of Shanon, pursuant to Counts Two and Three, and the court sentenced appellant, pursuant to Counts Four and Five, with regard to Sroufe.

{¶ 35} The cause is now before us upon an appeal as of right.

_____

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *William E. Breyer*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *Perry L. Ancona*, for appellant.

_____

**DOUGLAS, J.**

**{¶ 36}** Appellant advances twenty-nine propositions of law for our consideration. (See Appendix.) We have carefully considered each of appellant's propositions of law and have reviewed the death sentence for appropriateness and proportionality. For the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

**{¶ 37}** It is well settled that this court is not required to address and discuss, in opinion form, each and every contention raised by the parties in a death penalty appeal. See, *e.g.*, *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528; and *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 351, 662 N.E.2d 311, 318. We continue to follow that position today. Several issues raised by appellant have been addressed and rejected under similar circumstances in a number of our previous cases. Thus, these issues require little, if any, discussion. Further, some of appellant's arguments have been waived. Upon careful review of the record and the applicable law, we fail to detect any errors requiring reversal of appellant's convictions and death sentence. We are convinced that appellant received a fair trial, a fair and reliable sentencing determination, and competent representation during his trial. Accordingly, we address and discuss, in detail, only those matters that merit some discussion.

II

**{¶ 38}** At trial, appellant gave defense counsel a note indicating that from his jail window he had observed that a juror was given a ride by someone who he believed to be court personnel. Defense counsel brought the note to the trial court's attention. Thereafter, the following discussion occurred between the prosecutors, appellant, counsel for appellant, and the court:

"THE COURT [Judge Robert P. Ruehlman]: Yeah. That was juror No. — It was Janet Miller, Juror No. 7.

"Last night, it was about — oh, what time was it? I think it was after 6

o'clock.  I think it was after 6.

"THE DEFENDANT:  It was before 6.  I was looking out the window.  I got back up to the pod unit — it was like 5, 5:30, and went straight to the window, because I was writing a letter to my girlfriend, and looked out the window and happened to see her coming from this side of Court Street.  And I seen her.  She went to a bench to go catch her bus.  She was sitting there for a minute.  I was like: That's one of my jurors.  You know what I'm saying?  I had seen her Monday.

"THE COURT:  Right.  She missed her bus.  She missed her bus.

"THE DEFENDANT:  She walked to the bus stop.  She backed up.  And he parked.  And he was talking to her.  And she waved her hand off like:  No, I want to catch my bus.  My bus haven't came [*sic*] yet.

"She waved her hand up.  The bus came.  She walked to the bus and stood there and didn't get on.  And she took a ride with the dude.

"THE COURT:  What happened — she went back to the bus, and the bus driver said there's no more rides back out to where she lives.

"At that point she was downtown by herself, and there was bad storms coming up, with clouds, within ten minutes.  It was really bad rainstorm, bad thunderstorm.  And so I gave her a lift back to the Park and Ride.  So it's as simple as that.  We didn't talk about the case.

"MR. PIEPMEIER [prosecution]:  You were the one that took the —

"THE COURT:  Yeah,  She was parked at the Park and Ride.  There was no buses out there, going out there.  So that's why she went back to the bus.

"And she said:  My God, I missed the bus.

"I said — well, because I was wondering what she was doing sitting on the bench all by herself, because it's not a great part of town to live in, and there's a lot of crime down here and she's the only woman sitting all by herself on the bench.

"So the bus came.  I told her to check.  She checked.  The bus driver said: No more buses going your way.

"So I said: Get in, and we won't talk about the case.

"And I gave her a lift out.

"MR. PIEPMEIER: Okay.

"THE COURT: If you want me to take her off, I can always take her off the jury. She's a fairly reasonable juror. I think she's actually kind of — kind of one of those noncommittal jurors as far as the death penalty. If I were a defense attorney, I'd want her on the jury, you know, but it's up to you.

"MR. PANDILIDIS [defense counsel]: If we may have just like a minute or so to consult with our client at the table, and then we'll let you know.

"THE COURT: Sure. We didn't talk about the case at all. But my staff transports these people around. You know, they transport them to the scene and everything else. And they all work for me. So it's — whether I take her or somebody from the staff takes her, there was nobody from my staff around, and she was stuck down there.

" * * *

"THE COURT: You want to question the juror?

"MR. PANDILIDIS: No. I don't want to make a big deal —

"THE COURT: You have the right to question the juror, if you want to ask what we talked about.

"MR. PANDILIDIS: You gave me the opportunity to consult with my client after we brought this to your attention a few minutes ago.

"THE COURT: Okay.

"MR. PANDILIDIS: The client indicates to me he wants her off the jury. That is what I'm conveying to the Court now, to have her removed and replace her with the first alternate.

"MR. DETERS [prosecution]: Judge, you have access to these jurors all the time.

"THE COURT: Oh, sure. We tell them where to go. We talk to them.

"MR. LONGANO [prosecution]: The bailiff is with them 24 hours a day when we sequester them.

"MR. DETERS: If the trial judge in any case cannot be believed when he said he didn't talk to a juror —

"THE COURT: I've given him an opportunity to talk to this juror with his client present. He can talk to this juror and ask her. And he doesn't want to talk to her. So I'm going to overrule the motion.

"MR. PANDILIDIS: If you want — okay. I will question her, but I —

" * * *

"THE COURT: Let's bring her in.

" * * *

"MR. BREYER [prosecution]: I think the bottom line here is that the Court is a neutral party here. Since the Court is not one of the parties, he's not an adversary here. It's the Court's function to look out for the jury and to supervise the jury and for the Court.

"THE COURT: Exactly.

"MR. BREYER: — In the face of a juror who is in that strange part of town who needs a ride —

"THE COURT: I think it's important to establish we didn't talk about anything."

{¶ 39} Thereafter, the following discussion took place in the judge's chambers:

"MR. DETERS: Ma'am, why don't you sit right there?

" * * *

"THE COURT: * * *

"Last night she was waiting for a bus and I saw her. I don't know what time it was. 5:30, quarter to 6. It was getting late. It's not a nice part of town. And I stopped and asked her what was going on.

"And about that time another bus came up, and she talked to the bus driver, and evidently found out there was no more buses going out to the place where she had to park and ride.  She parks her car and then takes a bus.

"So a thunderstorm was coming, and it was actually a very bad thunderstorm.  There [were] tornado storm warnings and everything out.  This — there was actually a funnel cloud.

"So I — actually, what I did, I put her in my car and I gave her a ride to the Park and Ride.  And the first thing I said to her was:  'We can't talk about the case or anything.'

"Did we talk about the case?

"JUROR NO. 7:  No.

"THE COURT:  Say anything about the case?

"JUROR NO. 7:  No, not at all.

"THE COURT:  Okay.  Good.

"I'm saying as an officer of the Court I didn't talk about the case.  She's indicating that too.

"Did you want to ask anything?

"MR. PANDILIDIS:  Mr. Dixon will inquire.  Just a few questions, your Honor.

"MR. DIXON [defense counsel]:  Ms. Miller, what time was this?  Do you recall?

"JUROR NO. 7:  It was around like 20 till 6 or something like that.

"MR. DIXON:  Is that immediately after we got out of court last night?

"JUROR NO. 7:  It was a little after that.  I mean — well, when I —

"THE COURT:  It was a lot after that.

"JUROR NO. 7:  Yeah, because I was trying to get the bus.

"MR. DIXON:  Was anybody else in the car?

"JUROR NO. 7:  Excuse me?

14

"MR. DIXON:  It was just you and the Judge?

"JUROR NO. 7:  Yes.

"MR. DIXON:  How long of a ride was it?

"JUROR NO. 7:  Well, from here to Loveland.  I'm guessing — what?

"THE COURT:  Twenty-five minutes.

"JUROR NO. 7:  I was going to say twenty minutes.

"THE COURT:  Nothing was said about anything dealing with this particular case?

"JUROR NO. 7:  No.  As a matter of fact, I didn't say anything to anybody about anything.

"MR. DIXON:  I have nothing further.

"JUROR NO. 7:  Family or no one.

"THE COURT:  All right.

"MR. PIEPMEIER:  We have no questions.

"THE COURT:  You guys all know — you can check with the weather service.  They had a tornado warning out last night.

"MR. DETERS:  I don't think a common act of courtesy is any problem at all.

"THE COURT:  I don't either, as long as we're not talking about the case. I'm not going to let her stay in a bad part of town, especially with a thunderstorm.

"MR. PANDILIDIS:  I would just ask Mrs. Miller not discuss it with the other jurors.

"JUROR NO. 7:  I didn't say anything.  I absolutely said nothing to no one, no family, nothing."

{¶ 40} In propositions of law one through four, appellant raises various arguments predicated on the fact that Judge Ruehlman gave juror Miller a ride to her car after realizing that she had missed her bus.  Appellant contends that the contact between Judge Ruehlman and Miller was "presumptively prejudicial," that

the state failed to demonstrate that the contact was not prejudicial, that the judge should not have presided over the in-chambers hearing, and that he improperly influenced the responses given by Miller. Appellant also maintains that his counsel provided ineffective assistance of counsel in the manner in which Miller was questioned.

{¶ 41} Although Judge Ruehlman was clearly performing an act of kindness by trying to protect one of the jurors, his actions also, unfortunately, created the appearance of impropriety. Even if no discussion occurred between Miller and Judge Ruehlman regarding the case, the fact that Miller got into the judge's car was sufficient to raise a question of bias or collusion in the mind of appellant. Canon 1 of the Code of Judicial Conduct states, "An *independent* and honorable judiciary is indispensable to justice in our society." (Emphasis added.) Thus, Judge Ruehlman should have taken some alternate action when faced with the situation that confronted Miller. Moreover, the appearance of impropriety was compounded further by the fact that it was appellant and not Judge Ruehlman who first brought the incident to the attention of the parties when court convened the following morning.

{¶ 42} Appellant requested that the court remove Miller from the panel, which Judge Ruehlman had originally offered as an option. Judge Ruehlman ultimately denied appellant's request. The defense then requested and was granted the opportunity to question Miller. At the in-chambers hearing, Judge Ruehlman again stated what had transpired at the bus stop the previous day. Miller agreed with Judge Ruehlman, and she stated emphatically that they both never discussed the ongoing case.

{¶ 43} In *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643, this court set forth the procedure and applicable law a court must follow when an allegation is made that an improper communication has occurred with a juror. In *Phillips*, we held:

16

"When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror. *Smith v. Phillips* (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 84; *Remmer v. United States* (1954), 347 U.S. 227, 229-230, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656. 'In a criminal case, any private communication * * * with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *. [T]he burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.' *Id*. The Sixth Circuit, however, has held that the defense must prove that the juror has been biased. *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95, citing *Smith v. Phillips*, *supra*; contra *United States v. Littlefield* (C.A.9, 1985), 752 F.2d 1429, 1431. In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. See *United States v. Daniels* (C.A.6, 1976), 528 F.2d 705, 709-710; *United States v. Williams* (C.A.D.C.1987), 822 F.2d 1174, 1189." *Phillips*, 74 Ohio St.3d at 88-89, 656 N.E.2d at 660-661.

{¶ 44} Judge Ruehlman's presiding over the hearing did not amount to reversible error. Although the better practice in a case such as this would have been to have another judge preside over the hearing, the record does not indicate that Judge Ruehlman's conduct and involvement in the hearing were such that he improperly influenced the proceedings, thereby prejudicing appellant. At the hearing, Judge Ruehlman insisted that he and Miller did not discuss the case. He then questioned Miller and, without hesitation, she agreed with Judge Ruehlman as to what had occurred. Thereafter, defense counsel was given the opportunity to question Miller. Upon questioning by defense counsel, she repeatedly and forcefully expressed that she and Judge Ruehlman had not discussed the case. In fact, she stated that she had not discussed the case with anyone. Thus, although the

contact between Judge Ruehlman and Miller should not have occurred, it was, under the circumstances, harmless. Equally important, appellant has presented no evidence that he has been biased in any respect because of the contact.

{¶ 45} Appellant also contends that he was provided ineffective representation because defense counsel did not question Miller with "sufficient vigor," and because counsel did not object to her remaining on the jury. However, in order to prevail on a claim of ineffective assistance of counsel, appellant is required to show that, in light of all circumstances, counsel's performance fell below an objective standard of reasonableness. He must also show that prejudice arose from counsel's performance—that is, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-694, 104 S.Ct. 2052, 2064-2068, 80 L.Ed.2d 674, 693-698; and *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶ 46} The questioning of Miller by appellant's counsel was adequate in all respects. Counsel could have asked Miller and Judge Reuhlman what they had talked about, if anything, during the car ride to where Miller's car was parked. However, if defense counsel had vigorously questioned Miller, as suggested by appellant, and Miller remained on the panel, counsel would have risked alienating the juror. Following the hearing, defense counsel could have again requested that Miller be replaced. However, defense counsel was obviously convinced, and so are we, that the contact between Judge Ruehlman and Miller was not prejudicial to appellant.

{¶ 47} Appellant has failed to demonstrate that the trial judge in this case abused his discretion in proceeding with the trial and retaining Miller on the jury. *Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d at 661. Judge Ruehlman and Miller both stated repeatedly, and convincingly, that they did not talk about the case. There is no evidence that Judge Ruehlman's or Miller's obligation to be impartial has been

compromised in any manner. Appellant was not prejudiced by the innocent contact between the judge and juror and no constitutional rights have been deprived. Accordingly, we reject appellant's propositions of law one through four.

### III

{¶ 48} The offenses involving Nicole Sroufe and Shanon Marks were charged in the same indictment, resulting in a single trial. Appellant filed a motion to "grant him relief from prejudicial joinder." Specifically, appellant requested that the trial court grant "him a seperate [*sic*] trial on all Counts dealing with allegations pertaining to alleged acts on different dates than the date of the homicide." He also moved to prohibit the state from admitting evidence of any "other acts" allegedly committed by him.

{¶ 49} The trial court overruled both motions and held:

"Then on the motion for relief from prejudicial joinder, I find that both cases are—I mean, they're chillingly similar of young women. He lives close to them. He has a view of their house. It happened during the daytime. They were both violent attacks. And clearly I think there was a motive of robbery. * * *

"So under [Crim.R.] 8, two or more offenses may be charged if the offenses are of the same or similar character, which I feel they are, and they're part of a common scheme or plan. And under [Evid.R.] 404(B), * * * the prosecutor can use evidence from the prior case in Springdale [Sroufe incident] to show the motive here to be robbery."

{¶ 50} In his thirteenth proposition of law, appellant contends that the trial court abused its discretion by refusing to grant separate trials for the Sroufe offenses and for the aggravated murder of Shanon. Appellant also asserts that the consolidated trial resulted in the admission of "other acts" evidence that was prejudicial to him. We disagree.

"The law favors joining multiple criminal offenses in a single trial under Crim.R. 8(A). *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298.

Two or more offenses can be joined if they are of the same or similar character. *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 314-315, 421 N.E.2d 1288, 1290. An accused may move to sever under Crim.R. 14 if he can establish prejudice to his rights. *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298; *State v. Wiles* (1991), 59 Ohio St.3d 71, 76, 571 N.E.2d 97, 108. For the appellate court to reverse a trial court ruling that denies severance, the accused must show that the trial court abused its discretion. *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298; *State v. Torres*, *supra*, at syllabus.

"The prosecutor may counter the claim of prejudice in two ways. *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298. The first is the 'other acts' test, where the state can argue that it could have introduced evidence of one offense in the trial of the other, severed offense under the 'other acts' portion of Evid.R. 404(B). *Id.*; see, also, *Bradley v. United States* (C.A.D.C.1969), 433 F.2d 1113, 1118-1119. The second is the 'joinder' test, where the state is merely required to show that evidence of each of the crimes joined at trial is simple and direct. *State v. Lott*, *supra*; *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 16 O.O.3d 201, 204, 405 N.E.2d 247, 251; *State v. Torres*, 66 Ohio St.2d at 343-344, 20 O.O.3d at 315, 421 N.E.2d at 1291. If the state can meet the joinder test, it need not meet the stricter 'other acts' test. Thus, an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B). *State v. Lott*, *supra; State v. Roberts*, *supra; State v. Torres, supra*." *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, 5-6.

**{¶ 51}** The crimes against the two victims were not the same. However, the two crimes had similar characteristics. Both incidents involved female victims who lived in close proximity to appellant, and both involved violent theft offenses. In any event, regardless of the admissibility of evidence of other crimes in accordance with Evid.R. 404(B), the joinder test is easily met in this case.

{¶ 52} The evidence with respect to the offenses against the two victims was simple and direct. The jury could easily segregate the evidence. The first two witnesses called in the state's case-in-chief (Sroufe and Sergeant Thomas Wells) testified regarding the charges against appellant for the acts committed against Sroufe. The remainder of the testimony focused on the murder of Shanon. The only other connection at trial between the two victims occurred when Officer Ventre testified that during the course of the murder investigation he received a call from Sroufe, who had seen appellant interviewed by the local media. In this regard, we believe that it is very unlikely that the jury would have confused the evidence proving the separate offenses charged against appellant.

{¶ 53} Moreover, appellant has not attempted to argue that he would have defended either case differently if the charges had not been joined. *Franklin*, 62 Ohio St.3d at 123, 580 N.E.2d at 6. Under these circumstances, the trial court did not err in joining the offenses under Crim.R. 8(A) and subjecting appellant to a single trial. Thus, we find appellant's thirteenth proposition of law not well taken.

IV

{¶ 54} Appellant told police that a man named Dante was involved in the murder. The police asked appellant how they could find or who could identify that person. Appellant told them that his mother and Dante had lived on the same street, that his mother knew Dante, and that she could assist them in identifying him. Officer Robert Randolph testified that appellant's mother told him that she did not know anyone named Dante and had never heard of anyone by that name. Randolph was then asked by the prosecution whether, based on the investigation, he believed that "there was a second person that participated in this homicide with the defendant." He answered, "I don't believe there was a second person involved in this, no, sir."

{¶ 55} In his fourteenth proposition of law, appellant argues that it was error to allow Randolph to state his opinion that no other person was involved in the

crime. However, appellant failed to object at trial and, thus, he has waived all but plain error with respect to this testimony.

**{¶ 56}** In *State v. Webb* (1994), 70 Ohio St.3d 325, 638 N.E.2d 1023, this court considered a similar issue. In *Webb*, the court held that a police officer's opinion testimony was inadmissible under Evid.R. 701 because the rule "limits lay opinion testimony to 'opinions and inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.'" *Id*. at 333, 638 N.E.2d at 1031. Therefore, because the officer's opinion "was not based wholly on his perceptions, but at least partly on information from * * * others," it was inadmissible. *Id*. at 333, 638 N.E.2d at 1031-1032.

**{¶ 57}** As in *Webb*, the officer's opinion here was based partly upon the work of other investigators. The state's argument that the testimony was solicited to explain the focus of the police investigation is not fully supported by the evidence. Given the context of the questioning, the purpose of Randolph's testimony was clearly to discredit any theory of a second perpetrator.

**{¶ 58}** Nevertheless, we find no plain error. The evidence in this case clearly shows that appellant acted alone in this crime. Indeed, upon a careful review of the record before us, we find that appellant's statement concerning the involvement of a second person named Dante is simply not believable. Accordingly, appellant's fourteenth proposition of law is not persuasive.

V

**{¶ 59}** In his fifteenth proposition of law, appellant alleges that the trial court allowed into evidence testimony from two police officers that constituted prejudicial hearsay. Specifically, appellant points to (1) testimony by Officer Couch concerning discrepancies in statements given by appellant and statements from others regarding appellant's conduct on the morning of the murder, (2) testimony by Officer Randolph concerning statements from others as to what they

observed in the area of the murder scene on the morning of the murder, and (3) testimony by Randolph concerning statements appellant's mother made to Randolph when he questioned her about whether she knew an individual by the name of Dante.

{¶ 60} Appellant failed to object to the testimony at trial and, thus, has waived all but plain error with respect to these matters. Much of the testimony at issue was offered by the state to show inconsistencies in statements given by appellant to police. However, even assuming that some of the challenged testimony was hearsay, appellant has failed to demonstrate plain error, *i.e.*, that but for the alleged errors, the outcome of the trial would have been otherwise. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 562, 709 N.E.2d 1166, 1179. The testimony of Couch and Randolph clearly did not prejudice appellant and deny him a fair trial. Therefore, we find appellant's fifteenth proposition of law not well taken.

VI

{¶ 61} In his seventeenth and eighteenth propositions of law, appellant challenges the sufficiency and weight of the evidence as it relates to the Sroufe offenses. In his nineteenth and twentieth propositions of law, appellant challenges the sufficiency and weight of the evidence as it relates to the felony-murder of Shanon.

{¶ 62} When a defendant challenges the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. Moreover, in *State v. Fears* (1999), 86 Ohio St.3d 329, 342, 715 N.E.2d 136, 150, we stated that "[i]n capital cases, this court has the power to determine whether the weight of the evidence supports the judgment. *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 684 N.E.2d 668, 683-684. A verdict can be against the manifest weight of the

evidence even though legally sufficient evidence supports it. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148." See, also, R.C. 2953.02 ("The supreme court in criminal cases shall not be required to determine as to the weight of the evidence, except that, in cases in which a sentence of death is imposed for an offense committed on or after January 1, 1995, and in which the question of the weight of the evidence to support the judgment has been raised on appeal, the supreme court shall determine as to the weight of the evidence to support the judgment and shall determine as to the weight of the evidence to support the sentence of death as provided in section 2929.05 of the Revised Code.").

**{¶ 63}** "Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546, whereas the '[w]eight of the evidence concerns the "inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." ' " (Emphasis *sic*.) *Id*. at 387, 678 N.E.2d at 546." *Smith*, 80 Ohio St.3d at 113, 684 N.E.2d at 691.

A

**{¶ 64}** Upon a thorough review of the record, we are convinced that the evidence advanced by the state at trial was more than sufficient to prove the Sroufe offenses. In order to prove kidnapping, the state was required to establish that appellant "by force, threat, or deception * * * remove[d] another from the place where the person is found or restrain[ed] the liberty of another person" to "facilitate the commission of any felony or flight thereafter." R.C. 2905.01(A)(2). In addition, with respect to the robbery charge, the trial court instructed the jury under R.C. 2911.02(A)(3), which provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense," shall "[u]se or threaten the immediate use of force against another."

**{¶ 65}** Here, the state easily met its burden regarding both charges. At trial,

Sroufe identified appellant as the assailant. She testified that appellant approached her suddenly, grabbed her from behind, put one hand over her mouth, and his other hand around her waist. He then told her, "C'mon, you're coming with me. We're going back inside. Let's go." He started to drag her backwards. After she broke free, he asked her for money. Sroufe had marks on her neck from the incident. The trial testimony of Sroufe was believable and sufficient to establish appellant's guilt of the offenses beyond a reasonable doubt.

{¶ 66} Appellant also contends that, in accordance with *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, his kidnapping conviction should be reversed because there was no separate animus sufficient to sustain the charge. In *Logan*, syllabus, this court held:

"In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

"(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions."

{¶ 67} The guidelines set forth in *Logan* establish that a separate offense of kidnapping can occur if there is a prolonged restraint, a secretive confinement, or substantial movement of the victim. The offense can also occur if the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm

separate and apart from that involved in the underlying crime. See, also, *State v. Simko* (1994), 71 Ohio St.3d 483, 488, 644 N.E.2d 345, 351, citing *Logan*, 60 Ohio St.2d at 135, 14 O.O.3d at 378, 397 N.E.2d at 1351 ("the test to determine whether the kidnapping was committed with a separate animus and thus amounts to a separate offense is 'whether the restraint or movement of the victim is merely incidental to a separate underlying crime, or instead, whether it has a significance independent of the other offense' ").

{¶ 68} In *State v. Seiber* (1990), 56 Ohio St.3d 4, 14-15, 564 N.E.2d 408, 420, this court found kidnapping where the defendant repeatedly ordered bar patrons to lie on the floor while the defendant brandished his gun and threatened patrons with death. An accomplice of the defendant posted himself at the door, armed with a shotgun, and barred anyone from leaving. When one of the patrons refused to comply with the defendant's demands to lie on the floor, the defendant shot and killed him. Under these circumstances, the court held that it was reasonable for a jury to conclude that the defendant had restrained the victim of his liberty and that this evidence was sufficient to support the kidnapping charge and specification.

{¶ 69} Applying *Logan,* we believe that the record supports a finding that appellant's kidnapping conviction was proper. Further, the evidence of kidnapping here is as compelling as the facts and circumstances found sufficient to support a kidnapping conviction in *Seiber.* Again, the evidence set forth at trial established that appellant charged Sroufe. He attacked her from behind, grabbing her around the face and waist. The attack left marks on Sroufe. He then began to drag her away from her car. And, as he was dragging her, he stated, "C'mon, you're coming with me. We're going back inside. Let's go." After she was able to struggle free, appellant asked Sroufe for money. In this regard, the evidence indicates that appellant committed the offenses, each with a separate animus, and this evidence was both sufficient and substantial.

{¶ 70} Accordingly, appellant's seventeenth and eighteenth propositions of law are not well taken.

B

{¶ 71} With respect to the felony-murder of Shanon Marks, appellant claims that the evidence was insufficient to sustain his convictions on the charge of aggravated murder, the counts of aggravated burglary and aggravated robbery, and the R.C. 2929.04(A)(7) specifications of aggravating circumstances premised upon aggravated burglary and aggravated robbery. Appellant also claims that his convictions are against the manifest weight of the evidence. We strongly disagree. Clearly, the evidence presented at trial relating to these offenses was sufficient and substantial.

{¶ 72} In order to commit a theft offense in the Markses' home, appellant, using stealth, entered the home through the back door, wearing gloves and armed with a ball bat. He knew that the house was occupied, since he could see into the bathroom of the Markses' home. While in the home, he beat Shanon with a ball bat, causing her death. He then proceeded to a bedroom, where he found Shanon's purse on a bed. He emptied the contents of the purse and took her money. These facts clearly support his convictions. See R.C. 2903.01(B) (aggravated felony murder), 2911.11(A)(1) (aggravated burglary), 2911.01(A)(3) (aggravated robbery), and 2929.04(A)(7) (capital specifications of felony murder during an aggravated burglary and an aggravated robbery as the principal offender in the aggravated murder).

{¶ 73} Appellant also argues that "[e]ither the underlying felonies were allied offenses of similar import, or they were sufficiently separate and distinct that the killing did not occur 'while' * * * [he] was committing those felonies." Again, we disagree.

{¶ 74} The aggravated murder, aggravated robbery, and aggravated burglary charges are not allied offenses of similar import. Accord *State v. Reynolds*

(1998), 80 Ohio St.3d 670, 681, 687 N.E.2d 1358, 1371. Appellant committed aggravated burglary when he entered the home occupied by Shanon with the intent to commit a crime, carrying a ball bat as a weapon. He committed aggravated robbery when he viciously beat Shanon with the bat and took money from her purse. He committed aggravated murder when he killed Shanon. As a result, the offenses at issue were committed separately and with a separate animus.

{¶ 75} Additionally, this court has held that the actual robbery need not take place while the victim was still alive in order to convict for felony murder. See *State v. Rojas* (1992), 64 Ohio St.3d 131, 139, 592 N.E.2d 1376, 1384. Specifically, we have held that " '[t]he term "while" does not indicate * * * that the killing must occur at the same instant as the [underlying felony], or that the killing must have been caused by [it], but, rather, indicates that the killing must be directly associated with the [underlying felony] as part of one continuous occurrence * * *.' " *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, quoting *State v. Cooper* (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736. See, also, *State v. Biros* (1997), 78 Ohio St.3d 426, 450, 678 N.E.2d 891, 911.

{¶ 76} Accordingly, we find appellant's nineteenth and twentieth propositions of law not well taken.

## VII

{¶ 77} In his sixth and twenty-first propositions of law, appellant complains of several instances of alleged prosecutorial misconduct which, according to appellant, deprived him of a fair trial. Specifically, appellant alleges misconduct that occurred during both the guilt and penalty phases of the trial. We have carefully reviewed the record pertaining to these matters and have considered all of appellant's claims of prosecutorial misconduct. We have found no instance of misconduct that would rise to the level of reversible error. The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial and reliable sentencing determination. Appellant's sixth and

twenty-first propositions of law are overruled.

## VIII

{¶ 78} In his twenty-second proposition of law, appellant contends that the prosecution peremptorily excused the only potential African-American juror on the basis of her race. In *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries. *Id*. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82-83. See, also, *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1313. To make a prima facie case of purposeful discrimination, the defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race. *State v. Hill* (1995), 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271, 282. If the defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation. *Id*. at 445, 653 N.E.2d at 282. A trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. *Id*. See, also, *Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

{¶ 79} In the case at bar, the prosecution exercised a peremptory challenge against prospective juror Arthella Bray, an African-American woman. The defense raised a *Batson* claim to the prosecution's use of the peremptory challenge. The trial court then asked the prosecution to explain the challenge. The prosecution responded that Bray had expressed reservations about the death penalty, that she had a son the same age as appellant, that she had made plans (she was closing on a house and had tickets for a trip to Las Vegas where she was to get married), that she had a brother who had been prosecuted by the Hamilton County Prosecutor's

Office, and that she felt that there was a race problem between the police and African-American men.

**{¶ 80}** With respect to the *Batson* objection, the trial court required the state to respond and accepted the prosecution's race-neutral explanations for the use of the peremptory challenge. However, we question whether appellant ever demonstrated a prima facie case of purposeful discrimination that would have initially required a response by the prosecution. In any event, the prosecution set forth specific and race-neutral explanations. Clearly, the trial court's acceptance of the explanations and finding of no discriminatory intent were not erroneous.

**{¶ 81}** Appellant also claims that, because there were only four African-Americans out of a jury pool of fifty-two, he was denied a fair cross-section of jurors from the community. Appellant argues that only four African-American jurors out of a pool of this size is *de facto* exclusion.

**{¶ 82}** In *Taylor v. Louisiana* (1975), 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, the United States Supreme Court indicated that the Sixth Amendment guarantee of a jury trial "contemplates a jury drawn from a fair cross-section of the community." *Id.* at 527, 95 S.Ct. at 696, 42 L.Ed.2d at 696. However, the court held that there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (Citations omitted.) *Id.* at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 700.

**{¶ 83}** Appellant has failed to show either a *Batson* violation or that his jury was not a fair cross-section of the community as required by *Taylor*. Therefore, we reject appellant's twenty-second proposition of law.

IX

**{¶ 84}** In his twenty-fourth proposition of law, appellant contends that the trial court erred in admitting into evidence gruesome photographs. The crime-scene photos admitted into evidence depict where Shanon was found and that portions of her head and other parts of her body had been severely beaten. The coroner's photos depict Shanon's head and bodily injuries, with color photographs showing her head with the scalp pulled down to illustrate the damage that occurred to her skull.

**{¶ 85}** In accordance with Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d at 726. In *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus, we held that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." See, also, *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 273-274.

**{¶ 86}** Here, the trial court meticulously went through each photograph proffered into evidence and excluded many of them. The photographs admitted into evidence are neither cumulative nor repetitive. The crime-scene photographs illustrate the testimony of witnesses regarding how the body was found and that Shanon had been severely beaten. The coroner's photographs were used to illustrate the testimony that Shanon suffered massive head and other bodily injuries. The photographs were particularly probative not only of intent and purpose but also of "the cause, manner and circumstances of the victim's death." *Biros*, 78 Ohio St.3d at 445, 678 N.E.2d at 908. Furthermore, the coroner's photographs were also probative in that they rebutted appellant's statements that he had hit Shanon only three times and that a second person had struck her across the face with a gun.

**{¶ 87}** Although many photographs of Shanon's body were indeed gruesome, the evidence was highly probative. The value of that evidence clearly outweighed the danger of any unfair prejudice. Accordingly, we find appellant's twenty-fourth proposition of law not well taken.

X

**{¶ 88}** In his fifth proposition of law, appellant asserts that it was error for the trial court to readmit the photographs of the victim during the penalty phase. This proposition can be summarily rejected on the authority of *State v. DePew* (1988), 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542, 552.

XI

**{¶ 89}** In his twenty-fifth proposition of law, appellant contends that, due to adverse pretrial publicity, he could not, and did not, receive a fair trial in Hamilton County. On that basis, appellant claims that the trial court erred in not granting him a change of venue. In support, appellant points to the May 11, 1998 lead article in the Cincinnati Enquirer entitled "Taped confession details fatal attack." He also argues that tapes of statements made by him had been released to and played by the media. Appellant describes the media coverage as "incessant and exploitative."

**{¶ 90}** " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " (Emphasis *sic*.) *Landrum,* 53 Ohio St.3d at 117, 559 N.E.2d at 722, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051. See, also, *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus; and *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313-314. A trial court can change venue "when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18(B). However, " '[a] change of venue rests largely in the discretion of the trial court, and * * * appellate courts

should not disturb the trial court's [venue] ruling * * * unless it is clearly shown that the trial court had abused its discretion.' " *State v. Maurer*, *supra*, 15 Ohio St.3d at 250, 15 OBR at 388-389, 473 N.E.2d at 780, quoting *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 243, 289 N.E.2d 352, 355.

{¶ 91} We have reviewed the entire record in this case and there is nothing before us that supports appellant's allegations that he was denied a fair and impartial trial because of the alleged pretrial publicity. The record indicates that many prospective jurors who were questioned had obtained some information regarding the crimes committed by appellant. However, a "careful and searching *voir dire*," *Landrum*, *supra,* 53 Ohio St.3d at 117, 559 N.E.2d at 722, was conducted in this case and supports the conclusion that any pretrial publicity did not lead to an unfair trial. Appellant has presented no persuasive claim or evidence to disturb the trial court's conclusion that the impartiality of the members of the jury ultimately selected was not compromised by any pretrial publicity. In this regard, appellant has failed to demonstrate that the trial court abused its discretion in denying his request for a change in venue. Thus, appellant's twenty-fifth proposition of law is not well taken.

## XII

{¶ 92} Appellant gave separate tape-recorded statements to the police. Appellant confessed to killing Shanon, and he also attempted to implicate a second individual by the name of "Dante." Appellant moved to suppress incriminating statements. The trial court denied the motion. In his twenty-sixth and twenty-seventh propositions of law, appellant argues that these statements violated his privilege against self-incrimination and his right to counsel.

{¶ 93} Appellant's claims that his Fifth and Sixth Amendment rights were violated clearly lack merit. The police fully advised appellant of his *Miranda* rights and secured a waiver of those rights prior to obtaining the incriminating statements. The trial court correctly denied appellant's pretrial motion to suppress, finding that

his statements were voluntarily given and that appellant had effectuated a voluntary, knowing, and intelligent waiver of his *Miranda* rights before giving taped statements to the police.

{¶ 94} In addition, we also reject appellant's contention that, because he had been formally charged and had secured counsel with respect to the offenses committed by him against Sroufe, the police were prevented from questioning him regarding the murder of Shanon. A similar argument was raised and rejected by this court in *Hill*, 73 Ohio St.3d at 446, 653 N.E.2d at 283. Specifically, in *Hill*, citing *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158, we held that "an accused's Sixth Amendment right is offense-specific. Thus, under *McNeil*, appointment of counsel with respect to one offense does not bar police questioning as to a second uncharged offense." *Hill,* 73 Ohio St.3d at 446, 653 N.E.2d at 283.

{¶ 95} The evidence supports the trial court's decision to admit appellant's confessions as freely and voluntarily made. Further, the trial court's determination was lawful in all respects. See *DePew*, 38 Ohio St.3d at 277, 528 N.E.2d at 547.

XIII

{¶ 96} In his twenty-eighth proposition of law, appellant challenges the death-qualification process used during jury selection. Appellant argues that the trial court improperly used the standard set forth in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, to death-qualify the jury. Appellant's argument is misplaced.

{¶ 97} In *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, this court held that, in accordance with *Witt*, "[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of

his duties as a juror in accordance with his instructions and oath."

{¶ 98} Furthermore, we have no reason to question the trial court's decision to excuse prospective jurors Michael Kelly, Joyce Radford, Judith Jump, and Gloria Gosser. Their removal was warranted, since they clearly and unequivocally stated to the court that they would be unable to perform their duties as jurors. See, generally, *State v. Moore* (1998), 81 Ohio St.3d 22, 27, 689 N.E.2d 1, 8; *Rogers*, *supra*, paragraph three of the syllabus. Appellant's twenty-eighth proposition of law is overruled.

## XIV

{¶ 99} In his twenty-third proposition of law, appellant complains of various instances of alleged ineffectiveness of counsel which, according to appellant, occurred during the guilt and penalty phases of the trial court proceedings. We have considered all instances of alleged ineffectiveness of trial counsel alleged by appellant, and we find that appellant has failed to satisfy his burden of establishing ineffective assistance under the standards set forth in *Strickland*, *supra*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Appellant's twenty-third proposition of law is not well taken.

## XV

{¶ 100} In his seventh and eighth propositions of law, appellant challenges aspects of the trial court's penalty-phase jury instructions. However, we have reviewed the jury instructions as a whole and find appellant's objections not persuasive. Accordingly, we reject appellant's seventh and eighth propositions of law.

## XVI

{¶ 101} In his eleventh proposition of law, appellant argues that the trial court erred in its written sentencing opinion. However, any errors in the trial court's sentencing opinion can be readily cured by our independent review of appellant's death sentence. See, generally, *Lott*, 51 Ohio St.3d at 170-173, 555 N.E.2d at 304-

307.  See, also, *Reynolds*, 80 Ohio St.3d at 684-685, 687 N.E.2d at 1373; *State v. Gumm* (1995), 73 Ohio St.3d 413, 424, 653 N.E.2d 253, 265; and *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124, 131.  Appellant's eleventh proposition of law is without merit.

## XVII

{¶ 102} In his twenty-ninth proposition of law, appellant argues that the cumulative effect of errors at the trial court level deprived him of a fair trial and reliable sentencing determination.  We reject appellant's contention in this regard. Appellant received a fair trial and a fair and reliable sentencing determination, and appellant's twenty-ninth proposition of law is not well taken.

## XVIII

{¶ 103} In his ninth proposition of law, Johnson argues that Ohio's capital sentencing scheme violates the United States Constitution and that procedures that allow direct appeal to this court should be reexamined.  This court has examined and disposed of similar issues presented by appellant here.  See *State v. Raglin* (1998), 83 Ohio St.3d 253, 261-262, 699 N.E.2d 482, 490.  Thus, we summarily reject appellant's ninth proposition of law, including the arguments advanced under subsections (A) through (I).

## XIX

{¶ 104} In his tenth proposition of law, appellant argues that he should be entitled to twelve rather than six peremptory challenges.  This proposition can be summarily rejected.  *State v. Greer* (1988), 39 Ohio St.3d 236, 244-246, 530 N.E.2d 382, 394-396; *State v. Carter* (1995), 72 Ohio St.3d 545, 555-556, 651 N.E.2d 965, 975.

## XX

{¶ 105} We further reject appellant's twelfth proposition of law (see Appendix) on the authority of *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.  In addition, the matter set

forth in appellant's sixteenth proposition of law concerning the appropriateness of his death sentence is addressed in our discussion in Part XXI, *infra*.

## XXI

{¶ 106} Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality. The record clearly supports the finding that appellant was the principal and sole offender in the commission of this aggravated murder while committing an aggravated burglary and aggravated robbery.

{¶ 107} In mitigation, appellant presented the testimony of his grandmother and other witnesses. Appellant presented evidence that his parents never married, that they lived apart, that his mother became addicted to drugs as early as age nine, and that she gave birth to appellant when she was just fifteen years old. Because appellant's mother did not take care of him, and because she continued to pursue her drug habit, appellant lived most of his childhood with his grandmother. When appellant was three years old, he spent approximately a year in a foster home. Like his mother, appellant's father was also a drug addict. Appellant's mother and father both spent time in prison. Appellant never had a male role model and his environment was not nurturing. Appellant had some contact with his mother, but mostly she would promise to visit him and not show up. She has never functioned as a mother and at the time of trial was still involved with drugs.

{¶ 108} Testimony also revealed that appellant had trouble in the school setting. He was unable to sit still and was placed on Ritalin for a time. He was eventually put into a slow learners' class and he did not finish high school.

{¶ 109} During his childhood, appellant committed numerous criminal offenses. He was eventually placed with the Department of Youth Services. Various attempts were made by persons to help appellant, including the Big Brothers Program, his grandmother, and others. A psychologist told appellant's grandmother that appellant would do mean things because he loved his mother but

failed to get motherly love in return. Appellant's grandmother asked that his life be spared.

{¶ 110} Dr. Hawkins, a court-appointed psychiatrist, also testified in mitigation. Hawkins stated that during his interviews with appellant, appellant was concerned about protecting someone named Dante. Appellant maintained his innocence and was not remorseful. The testing performed by Hawkins indicated that appellant thinks very highly of himself and that his self-image is based on his success in conning the world around him. He has a full-scale IQ of eighty-three, which is in the low average range. Hawkins diagnosed appellant as having a chronic drug abuse problem and an antisocial personality disorder. Hawkins stated that appellant was not insane and that nothing indicated that he had any brain abnormality.

{¶ 111} Appellant gave an unsworn statement to the jury. He stated that he was sorry for what had happened and he expressed sympathy for Shanon's family. He asked that his life be spared so that he could be a "daddy" to his son, who was born just prior to this incident.

{¶ 112} Upon a review of the evidence in mitigation, it appears that appellant had a chaotic and troubled childhood. We find that appellant's history, character, and background, and, specifically, his personality disorder and drug dependence, are entitled to some, but very little, weight in mitigation. We have also considered the youth of the offender (appellant was nineteen years old at the time of the offense), the fact that he expressed some remorse, and, in addition, the nature and circumstances of the offenses. These factors are all entitled to some weight in mitigation.

{¶ 113} On the other side of the scale we weigh the two specifications of aggravating circumstances, proven beyond a reasonable doubt, that appellant was found guilty of committing. During the course of an aggravated murder, appellant committed an aggravated burglary and an aggravated robbery. After deep thought

and review, we find that the aggravating circumstances easily outweigh the mitigating factors beyond a reasonable doubt. The mitigating factors presented simply do not approach any level of significance when compared to the aggravating circumstances in this case.

{¶ 114} Finally, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously affirmed the death penalty. We find that appellant's death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. See, *e.g.*, *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; and *State v. Spivey* (1998), 81 Ohio St.3d 405, 692 N.E.2d 151. Indeed, this senseless, brutal, and incomprehensible act of inhumanity defies the imagination and is unquestionably the type of crime for which the General Assembly intended that a sentence of death could be invoked.

{¶ 115} For all the foregoing reasons, the judgment of the court of common pleas is affirmed. We affirm appellant's convictions and sentences, including the sentence of death.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., concur separately.

COOK, J., concurs in judgment.

—————————

**MOYER, C.J., concurring.**

{¶ 116} I concur in the decision and the opinion of the majority. I write separately to bring into sharper focus certain aspects of the trial judge's conduct that were inappropriate. The purpose of this concurrence is to dispel any impression that, because we have held that the trial court's conduct was

nonprejudicial in this case where the evidence of guilt was overwhelming, such conduct in another case may not be prejudicial.

{¶ 117} The foundation of a fair trial is that the court conducts itself in a fair and impartial manner. As the majority observed, " '[a]n *independent* and honorable judiciary is indispensable to justice in our society.' " (Quoting Canon 1 of the Code of Judicial Conduct.) Judges must not only be fair and impartial, they must also avoid conduct that would create the perception that they are not fair and impartial. I agree with the majority that the trial judge's conduct here did not prejudice the defendant, but that the judge allowed his impartiality to be questioned.

{¶ 118} No one would doubt that the trial judge was acting from a sense of responsibility and perhaps kindness when he drove juror Miller to her car. There also can be no question that there were alternate means by which the trial judge could have and should have demonstrated his concern for the well-being of juror Miller.

{¶ 119} I agree with the majority opinion that the trial judge's conduct was improper in the following respects: (1) he drove the juror to her car, rather than providing an alternate means for her to safely arrive at her destination; (2) he failed to inform counsel the following morning of his conduct the prior evening; (3) he offered to remove the juror if defense counsel requested it, and then denied defense counsel's motion to remove the juror; and (4) when defense counsel requested a hearing to examine the juror, the trial judge presided over the hearing at which his conduct was in question.

{¶ 120} It is the fourth aspect of the trial judge's conduct that I believe should be more forcefully and unequivocally disapproved than the majority does in its opinion. When defense counsel requested a hearing to determine whether there had been any discussion between the trial judge and juror Miller during their ride in the trial judge's car, the trial judge should have either remained outside his chambers or should have requested another judge of the Hamilton County Common

Pleas Court to conduct the brief hearing. No juror should be placed in the position that juror Miller was placed by the trial judge. As the transcript reflects, the trial court began the hearing by explaining the circumstances of his offer of a ride. He then asked the juror to agree with him that they did not talk about the case. When defense counsel had his opportunity to inquire of the juror, the trial judge answered three questions for her and expanded upon two of her answers, thereby testing the presumption that a trial judge conducts himself or herself pursuant to the rule and the law.

{¶ 121} The cases cited by the majority setting forth the procedure and applicable law that a court is to follow when an allegation is made that an improper communication has occurred with a juror all derive from contact with a juror by someone other than the judge who is conducting the trial. Whether one follows the rule that the burden is upon the state to prove juror prejudice or to deny a presumption of prejudice, surely a hearing, however brief, to determine the circumstances of extended private contact between a judge and juror should be conducted by someone other than the judge whose conduct resulted in the circumstance being questioned. We should state such a rule of law in the syllabus of this case.

LUNDBERG STRATTON, J., concurs in the foregoing concurring opinion.

_____

APPENDIX

{¶ 122} "*Proposition of Law No. 1*: It is inimical to the rights of the accused in a capital case for the trial judge, during the guilt/innocence phase of the proceedings, to have deliberate, private, personal contact with one of the jurors, not in the presence of the accused or counsel for both parties, in violation of the right of the accused to due process of law under the Fourteenth Amendment to the Constitution of the United States and Art. I Sec[tion] 16 of the Ohio Constitution, and, where the death sentence is ultimately imposed by that juror, and by that judge,

such improper contact between judge and juror also violates the Eighth Amendment of the United States Constitution and Art. I Sec[tion] 9 of the Ohio Constitution.

**{¶ 123}** "*Proposition of Law No. 2*: Where, in the middle of a capital trial, a question arises as to whether the trial court and/or a juror has committed misconduct, it is reversible error and a denial of due process of law, secured to the accused by the Fourteenth Amendment to the United States Constitution and by Art. I Sec[tion] 16 of the Ohio Constitution, for the trial court whose possible misconduct is the issue, to itself preside over the proceedings required by law to determine whether such misconduct has occurred, and, if so, whether it has been prejudicial to the accused.

**{¶ 124}** "*Proposition of Law No. 3*: Where, in the middle of a capital trial, a question arises as to whether the trial court and/or a juror has committed misconduct, it is a denial of due process under the Fourteenth Amendment to the Constitution of the United States, and Art. I Sec[tion] 16 of the Ohio Constitution, for the trial judge, whose possible misconduct is the issue, conducting an inquiry as to such matters, to conduct that inquiry in such a manner that the juror is essentially informed by the trial court as to the answers that will insulate them both from a finding of misconduct, and which hearing does not establish whether the accused has been prejudiced by the improper private contact between his judge and one of his jurors.

**{¶ 125}** "*Proposition of Law No. 4*: Where, during a hearing in the middle of a capital trial concerning whether the trial court and/or a juror had committed misconduct, presided over by the trial court, counsel for the accused does not interrogate the juror with sufficient vigor so as to demonstrate each and every conversation occurring between the trial court and the juror during their prolonged personal contact, so as to either confirm or dispel whether or not the misconduct was prejudicial to the accused, the accused has been denied the right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the

Constitution of the United States and Art. I Sec[tion] 10 of the Ohio Constitution.

{¶ 126} "*Proposition of Law No. 5*: In a capital prosecution for aggravated murder, the killing itself is not an aggravating circumstance, and it is error inimical to the right to due process of law under the Fourteenth Amendment to the U[nited] S[tates] Constitution and Art. I Sec[tion] 16 of the Ohio Constitution, as well as the Eighth Amendment to the U[nited] S[tates] Constitution and Art. I Sec[tion] 9 of the Ohio Constitution, for the trial court to admit, at the penalty phase of the trial, evidence including gruesome photographs of the deceased, under the pretext that the killing itself, admittedly not an aggravating circumstance, is nevertheless an essential element of the felony-murder aggravating circumstances of which the offender was convicted.

{¶ 127} "*Proposition of Law No. 6*: Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal, and where the prosecutor's final argument for death argues nonstatutory aggravating factors, contains inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such arguments is plain error and violates due process and the Eighth Amendment of the United States Constitution, and their counterparts in the Ohio Constitution, requiring reversal of the death sentence.

{¶ 128} "*Proposition of Law No. 7*: Where a death sentence is imposed after the trial court initially gives a correct instruction as to the definition of mitigating factors, but, after the conclusion of the instructions, thereafter at the request of the state, expressly instructs the jury that the terms 'fairness' and 'mercy' are to be excised from the definition of mitigating factors, over defense objections, the Eighth Amendment rights of the accused, as well as his Fourteenth Amendment right to due process of law, have been violated, requiring reversal of the death sentence.

{¶ 129} "*Proposition of Law No. 8*: An instruction to a jury in the penalty

phase of a capital trial to the effect that it must consider the death sentence before considering any life sentence option renders the death sentence imposed in violation of the Eighth Amendment rights of the accused, as well as the rights secured to him by O[hio] Const[itution] Art. I Sec[tion] 9.

{¶ 130} "*Proposition of Law No. 9*:  The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

{¶ 131} "[*Sub-Proposition of Law 9(A)*:]  The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

{¶ 132} "[*Sub-Proposition of Law 9(B)*:]  Both locally, statewide and nationally, the death penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

{¶ 133} "[*Sub-Proposition of Law 9(C)*:]  The use of the same operative fact to first elevate what would be 'ordinary' murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony-murder case than in a case involving prior calculation and design, although both crimes are ostensible [*sic*] equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

{¶ 134} "[*Sub-Proposition of Law 9(D)*:]  The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating

circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional. [Emphasis *sic*.]

{¶ 135} "[*Sub-Proposition of Law 9(E)*:] The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors may only slightly outweigh mitigating factors.

{¶ 136} "[*Sub-Proposition of Law 9(F)*:] The provisions [*sic*] of Crim.R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept 'in the interests of justice' (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

{¶ 137} "[*Sub-Proposition of Law 9(G)*:] The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty.

{¶ 138} "[*Sub-Proposition of Law 9(H)*:] The decision[s] of the Supreme Court of Ohio in [*State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, and *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311] [have] rendered the Ohio capital statutes unconstitutional in that they encourage, rather than prevent, the arbitrary and capricious imposition of the penalty o[f] death.

**{¶ 139}** "[*Sub-Proposition of Law 9(I)*:]   The amendments to the Ohio Constitution occasioned by the passage of Issue One, and the amendments to the Revised Code enacted by the General Assembly to facilitate the changes in the Ohio Constitution governing capital cases, violate the right of capital defendants to be free from cruel and unusual punishments, secured to them by the Eighth Amendment to the U[nited] S[tates] Constitution, and to due process of law and the equal protection of the laws secured to them by the Fourteenth Amendment to the U[nited] S[tates] Constitution.   The amendment to R.C. 2953.02, purporting to enable the [Ohio] Supreme Court to weigh evidence in a capital case violates the Ohio Constitution.

**{¶ 140}** "*Proposition of Law No. 10:*   The increased need for reliability required in capital cases by the Ohio and federal Constitutions mandates the granting to the defense [of] more than six peremptory challenges.

**{¶ 141}** "*Proposition of Law No. 11:*   The Eighth Amendment requirement of reliability in capital sentencing is violated where the sentencing opinion of the trial court fails to state the reasons why aggravation outweighs mitigation, and relies upon the nature and circumstances of the offense as an aggravating circumstance, as well as other nonstatutory aggravating circumstances.

**{¶ 142}** "*Proposition of Law No. 12*:   Under the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed.

**{¶ 143}** "*Proposition of Law No. 13*:   It is reversible error inimical to the right to the fundamentally fair trial guaranteed by the Due Process Clauses of the Fourteenth Amendment to the U[nited] S[tates] Constitution and Art. I Sec[tion] 16 of the Ohio Constitution for the trial court to deny a motion for separate trials for two series of offenses where prejudicial evidence as to one series of offenses is not admissible in the trial of the other series of offenses.

{¶ 144} "*Proposition of Law No. 14:* The admission of opinion evidence by police officers to the effect that suspects other than the defendant are not guilty of the offense being tried is prejudicial plain error violative of the defendant's right to due process of law under the Fourteenth Amendment to the U[nited] S[tates] Constitution, and Art. I Sec[tion] 16 of the Ohio Constitution.

{¶ 145} "*Proposition of Law No. 15:* It is prejudicial, plain error for a trial court to permit prejudicial hearsay evidence in a capital trial, in violation of Ohio evidentiary rules and in violation of the right of confrontation secured to the accused by the Sixth and Fourteenth Amendments to the U[nited] S[tates] Constitution, and Art. I Sec[tion] 10 of the Ohio Constitution.

{¶ 146} "*Proposition of Law No. 16:* Where the state fails to establish beyond a reasonable doubt that aggravation outweighs mitigation beyond a reasonable doubt, the death penalty is absolutely precluded, and the imposition of the death sentence under such circumstances constitutes a violation of the offender's constitutional right to be free of cruel and unusual punishment and also his right to due process of law.

{¶ 147} "*Proposition of Law No. 17:* Where there is slight asportation, which is merely incidental to the underlying crime, and committed without a separate animus, a conviction of kidnapping is contrary to law and violates the Due Process Clause of the Fourteenth Amendment and Art. I Sec[tion] 16 of the Ohio Constitution.

{¶ 148} "*Proposition of Law No. 18:* Proof that the defendant grabbed the victim momentarily, and dragged her a few feet, and asked her for money only after her release from his grasp, is legally insufficient to support convictions for robbery and kidnapping, but support, at most, a misdemeanor assault conviction.

{¶ 149} "*Proposition of Law No. 19:* Where the state fails to prove beyond a reasonable doubt the essential elements of aggravated murder, aggravated robbery, and aggravated burglary, or where there is no separate animus to the

burglary and robbery charge, the defendant's conviction for felony specifications to aggravated murder, as well as the underlying felonies of aggravated robbery and aggravated burglary must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 150} "*Proposition of Law No. 20:* Convictions for aggravated murder, aggravated burglary and aggravated robbery which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 151} "*Proposition of Law No. 21:* Egregious prosecutorial misconduct during the guilt phase of a capital prosecution prejudices the due process right of the accused to a fair trial under the Fourteenth Amendment to the U[nited] S[tates] Constitution, and Art. I Sec[tion] 16 of the Ohio Constitution, requiring reversal of his conviction and a new trial.

{¶ 152} "*Proposition of Law No. 22:* It is constitutionally impermissible under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U[nited] S[tates] Constitution for the state, in a capital prosecution, to exclude from the jury prospective jurors solely on the basis of their race.

{¶ 153} "*Proposition of Law No. 23:* Where the defendant in a capital murder trial is deprived of the effective assistance of counsel at both the guilt/innocence and penalty phases of his trial, his conviction and death sentence offend the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and their counterparts in the Ohio Constitution, and must be reversed, and a new trial granted.

{¶ 154} "*Proposition of Law No. 24:* A conviction and death sentence for aggravated murder must be reversed as violations of the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment, and the Sixth Amendment of the right to trial before a fair and impartial jury, as well as the Eighth Amendment prohibition against cruel and unusual punishment, where the

conviction and death sentence were obtained through use of repetitive, cumulative photographs of the corpse of the deceased, the net prejudicial effect of which far outweighed their probative value.

{¶ 155} "*Proposition of Law No. 25:* Where the right of a defendant in a capital criminal case to a fair trial is prejudiced by excessive and grossly prejudicial new[s] media accounts, the Due Process Clause of the Fourteenth Amendment requires reversal, and, where the sentence imposed by the jury is death, the Eighth Amendment rights of the accused have been violated as well.

{¶ 156} "*Proposition of Law No. 26:* Convictions obtained through the use of statements obtained in violation of the defendant's privilege against self-incrimination, secured to him by the Fifth and Fourteenth Amendments to the Constitution of the United States, and Art. I Sec[tion] 10 of the Ohio Constitution, must be reversed and remanded for new trials at which such statements are excluded from evidence.

{¶ 157} "*Proposition of Law No. 27:* Convictions obtained through the use of statements obtained in violation of the defendant's right to counsel secured to him by the Sixth and Fourteenth Amendments to the Constitution of the United States, and Art. I Sec[tion] 10 of the Ohio Constitution, must be reversed and remanded for new trials at which such statements are excluded from evidence.

{¶ 158} "*Proposition of Law No. 28:* A death sentence recommended by a jury from service on which one or more veniremen were excused because of their views concerning capital punishment cannot stand unless it affirmatively appears on the record that each such veniremen [*sic*] excused for cause unequivocally indicates that his scruples against capital punishment will automatically prevent him from recommending the death penalty and/or that such views will render him unable to return a verdict of guilty no matter what the evidence, and that he is prevented by his scruples from following the instructions of the court and considering fairly the imposition of the death sentence.

{¶ 159} "*Proposition of Law No. 29:* Where, during a criminal trial, there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal."