DECISION.
I. Underlying Offenses and Proceedings
Following a guilty verdict, appellant Rayshawn Johnson was convicted of the purposeful killing of Shanon Marks during the commission or the attempted commission of an aggravated burglary and/or aggravated robbery, in violation of R.C. 2903.01(B). He was also found guilty and convicted of the R.C. 2929.04(A)(7) death-penalty specifications of aggravated burglary and aggravated robbery that accompanied the murder charge. Following a mitigation hearing, the trial court accepted the jury's recommendation and imposed the death penalty.
In addition to the aggravated murder, the jury found Johnson guilty of one count of aggravated burglary and one count of aggravated robbery involving Marks. The trial court imposed a ten-year sentence for each of these counts.
Joined for trial with the offenses relating to Marks's murder were robbery and kidnapping charges that resulted from Johnson's encounter with Nicole Sroufe a month before Marks's murder. The jury found Johnson guilty of kidnapping and robbing Sroufe, and the trial court sentenced him to eight years' incarceration for the kidnapping, and to five years' incarceration for the robbery. All sentences were to run consecutively.
Johnson appealed to the Ohio Supreme Court, which affirmed his convictions, including the death sentence.[1] Johnson then filed a petition for postconviction relief in the trial court, raising thirty-two grounds for setting aside his convictions. After Johnson strenuously argued for the recusal of the judge who had presided over his original trial, another judge was appointed to consider Johnson's postconviction petition, which eventually was denied without an evidentiary hearing. Johnson now appeals the judgment denying him postconviction relief.
 II. Johnson's Postconviction Appeal
In his appeal, Johnson raises three assignments of error. In his first assignment, he contends that the trial court erred by dismissing his postconviction petition when there was sufficient evidence outside the record to merit an evidentiary hearing and discovery. Johnson claims, in his second assignment, that Ohio's postconviction statutes fail to afford an adequate corrective process, and violate the due-process and equal-protection guarantees under the Fourteenth Amendment of the United States Constitution, because there are no provisions for discovery. In his third assignment, Johnson claims that the cumulative errors documented by his petition and demonstrated by the record merit a reversal of the trial court's judgment.
 Johnson's Burden to Demonstrate Entitlement to an Evidentiary Hearing
Johnson's first assignment challenges the trial court's denial of each of his thirty-two claims for postconviction relief without an evidentiary hearing. Specifically he argues that the trial court erred by applying the doctrine of res judicata, that summary judgment on his claims was inappropriate, and that where he had the burden to present evidence outside the record and the petition was dismissed without allowing discovery, he was precluded from an effective remedy.
R.C. 2953.21 through 2953.23 set forth the means by which a convicted defendant may seek to have the trial court's judgment or sentence vacated or set aside. Postconviction relief allows a petitioner to make a collateral civil attack on his criminal conviction by filing a petition to set aside the judgment. The relief afforded under the statutes is applicable, however, only where the petitioner's rights in the proceedings that resulted in his conviction were denied to such an extent the conviction is rendered void or voidable under the Ohio or the United States Constitution.[2]
Before granting a hearing on a petition, the trial court must determine, upon consideration of the petition, all the files and records pertaining to the underlying proceedings, and any supporting evidence, whether the petitioner has "set forth sufficient operative facts to establish substantive grounds for relief."[3] If the petition and the files and records show that the petitioner is not entitled to relief, the court may dismiss the petition without an evidentiary hearing.[4] If the trial court dismisses the petition, it has the obligation to make and file findings of fact and conclusions of law.[5]
A trial court may dismiss a postconviction claim under the doctrine ofres judicata. A claim is res judicata if it "was raised or could have been raised at trial or on direct appeal."[6] Where, however, the claim depends on factual allegations that cannot be determined from the files and records, and the petitioner presents cogent evidence outside the record, res judicata does not apply, and an evidentiary hearing must be had.[7]
The evidence outside the record must be competent, relevant, more than marginally significant, and must "advance the claim `beyond mere hypothesis and a desire for further discovery.'"[8] Further, the evidence "must not be cumulative or alternative to the evidence presented at trial."[9] The evidence also "must be more than evidence which was in existence and available to the defendant at the time of trial and which could and should have been submitted at trial if the defendant wished to make use of it."[10]
Where the evidence outside the record consists of affidavits,
 the trial court should consider all the relevant factors when assessing the credibility of the affidavits. These factors include whether the judge reviewing the postconviction petition is the same judge who presided over the trial, whether the affidavits submitted contain identical language or appear to have been drafted by the same person, whether the affidavits contain or rely on hearsay, whether the affiants are relatives of the petitioner or interested in the petitioner's success, and whether the affidavits contradict evidence proffered by the defense or are inconsistent with or contradicted by the affiant's trial testimony.[11]
But even with the truthfulness of an affidavit assumed, if the information it contains "does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential."[12]
 IV. First Assignment-Grounds for Relief-Ineffective Assistance of Counsel
The majority of Johnson's claims for relief allege ineffective assistance of counsel. Generally, the introduction of evidence outside the record concerning ineffective assistance of counsel is sufficient to avoid dismissal of the claim on the basis of res judicata.[13]
To prevail on his claims of ineffective assistance, Johnson had the burden to show "(1) that counsel performed so deficiently that they were not functioning as the `counsel' guaranteed by the Sixth Amendment and (2) that counsel's [sic] errors were prejudicial."[14] Deficient performance exists when counsel's conduct "falls below an objective standard of reasonable representation."[15] Prejudice is defined as a "reasonable probability that but for counsel's errors, the result of the proceeding would have been different; `[a] reasonable probability is a probability sufficient to undermine [the court's] confidence in the outcome.'"[16]
A strong presumption exists that trial counsel rendered effective assistance and that a challenged activity was a sound trial strategy under the circumstances.[17] Further, witness selection falls within the arena of trial strategy and generally will not constitute ineffective assistance.[18] Similarly, the existence of alternative or different mitigation theories does not constitute ineffective assistance.[19]
 A. The Penalty Phase
The substance of nineteen of Johnson's thirty-two claims for relief is that trial counsel was ineffective for failing to investigate, prepare, and/or present mitigating evidence during the sentencing phase of his trial. His first, second, and third claims focus on counsel's alleged failure to provide the jury with mitigation evidence that would have humanized Johnson. His fourth and fifth claims allege that trial counsel spent insufficient time in investigating and preparing for Johnson's mitigation hearing. His sixth and seventh claims contend that counsel was ineffective for not providing reasons to spare Johnson's life. His eighth and seventeenth claims for relief are based on counsel's failure to present evidence of Johnson's ability to adapt to a structured environment. Johnson's fourteenth, fifteenth, sixteenth, twenty-sixth, and twenty-seventh claims allege that counsel was ineffective due to the failure to provide the jury with evidence of Johnson's generational family history so that significant family patterns could be assessed. Johnson's twenty-second, twenty-third, twenty-fourth, and twenty-eight claims contend that counsel was ineffective for failing to protect Johnson's Eighth Amendment right to have the jury consider and give effect to available, relevant mitigating evidence. In his thirty-second claim for relief, he alleges that trial counsel was ineffective for failing to provide evidence that would have helped the jury understand his lack of positive role models.
 1. Evidence Outside the Record
In support of his claims for relief, Johnson submitted evidence outside the record in the form of documents, evaluations and assessments, and affidavits. The affidavits included the following: (1) his own affidavit; (2) the affidavits of his mother and grandmother; (3) the affidavits of close friends; (4) the affidavit of his girlfriend, who was the mother of his child; (5) the affidavit of his foster mother; (6) the affidavits of the mitigation expert and the assistant mitigation expert who assisted at his hearing; (7) the affidavit of a mitigation specialist; (8) the affidavit of a psychologist who detailed what preparation was necessary in a capital case, including the necessity of an alcohol and drug assessment, and who provided such an assessment of Johnson; (9) the affidavit of the psychiatrist who testified on Johnson's behalf; (10) the affidavit of a neuropsychologist, which provided a neuropsychological evaluation of Johnson; and (11) the affidavit of a sheriff regarding Johnson's lack of disciplinary problems in a structured environment. He also supplied his mother's hospital records, which detailed her history of substance abuse and psychiatric problems.
The gist of the evidence outside the record regarding Johnson's background demonstrates that Johnson's maternal grandmother, Marian Faulkner, was a heavy drinker, possibly an alcoholic, who got violent when she was angry. She abused Johnson's mother. The evidence also demonstrates that Faulkner was reported to have emotional problems, and that she and her husband physically abused Johnson and his brother while they lived with her.
The evidence also demonstrates that Johnson's mother did not take care of her children, and that she physically abused them. It also indicates that she was raped as a child by Faulkner's friend, that she spent time in juvenile detention, and that she was incarcerated as an adult. It also shows that Johnson's mother was a drug abuser who was physically abused by the men in her life, and who killed one of her abusers. She had also been hospitalized for depression and suicidal ideation.
According to the affidavit of his foster mother, Johnson did well as a child when he was at her home, and he, in fact, referred to her as "Mom."
Dr. Robert Smith, a psychologist trained in chemical dependency, provided an affidavit in which he stated that preparation for a capital case required obtaining extensive background on the defendant across his lifetime, including the dynamics and functioning of the defendant's family of origin. He stated that a substance-abuse expert was necessary to conduct a comprehensive substance-abuse history, to determine the impact of alcohol or drug use on the defendant's behavior in the commission of the crime, and to testify as to the cause of addiction and the interaction between psychiatric disorders and substance abuse.
Dr. Smith provided a psychological report on Johnson following a three-hour interview, the administration of some psychological tests, and a review of documents pertaining to Johnson's crime, other evaluations and assessments, and Johnson's school history. Dr. Smith concluded that Johnson was addicted to marijuana and alcohol. According to the psychologist, these substances affected his central nervous system and caused "impulsivity, mood swings, irritability, poor judgment, difficulty concentrating, and distortions in memory." The drugs also exacerbated Johnson's feelings of sadness and anger. Because of his dysfunctional family, Johnson was unable to resolve his anger and cope with his feelings. According to Dr. Smith, Johnson's addiction and family history played a significant role in his murder of Marks.
Psychologist Sharon Pearson administered several tests to Johnson, reviewed the transcript of his trial and various records and reports relating to Johnson, and conducted interviews with him. Her report documented Johnson's history of physical abuse and parental deprivation, including beatings by Faulkner, his placement in a classroom for developmentally handicapped children, and his history of mental-health treatment.
Pearson determined that Johnson was likely to adjust to the structured environment of prison. She also stated that his mother's history of drug abuse during her pregnancy, Johnson's history of attention deficit disorder and drug abuse, his unusual skull formation, and his drooping eye were indicators that a neuropsychological evaluation should have been performed. She concluded that Johnson, like his parents, had an antisocial personality disorder characterized by a disregard for the rights of others. As a result of his home environment, Johnson learned that violence was a way to express anger and frustration.
According to Dr. Pearson, on the day of Marks's murder, Johnson felt that his life was falling apart and was "high" on marijuana. In her view, these factors probably played a part in allowing him to commit the murder.
Neuropsychologist Dr. Jeffrey Allen provided in his affidavit a history of Johnson's life and the result of certain tests administered to him. The tests indicated that Johnson was of low-average intelligence and had memory problems and cognitive difficulties, and that his abuse of alcohol may have contributed to his cognitive dysfunctioning. Dr. Allen believed more testing could identify "any relationship between Mr. Johnson's attentional problems and his cognitive decisionmaking potential." He also concluded, in a separate affidavit, that Johnson would do well in a structured environment.
Dorian L. Hall, a mitigation specialist, provided an affidavit in which she stated that an essential element of a capital case was preparation for mitigation. According to Hall, effective mitigation preparation involved gathering and reviewing all the information about a defendant and his family in order to construct a psycho-social history and to convey an understanding of the defendant, as well as presenting the material to a licensed psychologist in order to obtain an explanation of the defendant's behavior during the offense and to develop a cohesive theory of mitigation. Hall also provided what she believed to be the best approach to handle the mitigation phase, and emphasized the importance of having enough time to do what was necessary and the need for communication among the mitigation team members. Hall concluded that several of Johnson's records were not obtained, that witnesses who could testify about Johnson's psycho-social history did not testify, and that Johnson's and his family's history of drug abuse was not sufficiently explored. As a result, Hall opined that Johnson's counsel failed to present a complete mitigation case, and that Johnson's expert failed to testify about Johnson's ability to adapt to confinement.
Faulkner's affidavit stated that Johnson's trial counsel had not spoken with her until after the jury had begun deliberations during the guilt phase of Johnson's trial. She also stated that she did not meet with a mitigation "person" until a week before the mitigation hearing, that the mitigation "person" did not spend much time with her, and that he had said that he needed more time than the defense had provided him to gather all the necessary information.
Chuck Stidham, Johnson's mitigation specialist, provided an affidavit in which he stated that he did not have enough time to properly prepare for the mitigation phase, and that he wanted to further explore the possible effects of crack cocaine on a fetus during pregnancy. Stidham's assistant reiterated the necessity for more time and outlined the people with whom he spoke.
Dr. Hawkins, the psychiatrist who testified at the mitigation hearing, stated in his affidavit that he spent approximately one and one-half hours with Johnson's trial counsel and that he met with Johnson twice. He stated that he was asked to evaluate Johnson relative to the legal standard for insanity, to make a diagnosis, and to assess Johnson for mitigating factors. He was not asked by counsel to evaluate Johnson regarding his ability to adapt to incarceration, and he was not provided with Johnson's Department of Youth Services records, as required for a thorough evaluation.
Johnson also provided records from various institutions demonstrating that, even as a toddler, he was aggressive, that he adapted well to structured environments, and that he got in trouble when he was released from institutions. He also presented records relating to his mother's childhood and her history of drug, legal, and psychiatric problems. The records also referred to Johnson's grandmother's inappropriate parenting skills with Johnson's mother. A deputy sheriff's affidavit stated that, during the time Johnson was at the Hamilton County Justice Center, he had no record of disciplinary action taken against him.
 2. Evidence in the Record
During the mitigation phase of Johnson's murder trial, Johnson presented the testimony of his foster mother, his maternal grandmother, and Dr. Hawkins, and his own unsworn statement.
Johnson's foster mother testified that Johnson was placed with her when he was three years old, and that he stayed for one year. He was then released to his grandmother. Johnson returned to stay with the foster mother during the summer months until he was approximately ten years old. She testified that Johnson behaved very well when he stayed with her and called her "Mom," and that she had no trouble with him. Johnson also got along well with the other foster children in her home. She testified that she had no knowledge of his background. She further testified that she believed that his life should be spared.
The maternal grandmother, Faulkner, testified that Johnson's mother lived with her on and off until she was fifteen, that his mother had been addicted to drugs since she was nine years old, and that Faulkner had sought psychiatric treatment for her. She testified that her daughter had Johnson when she was fifteen or sixteen years old, while she was abusing drugs. After Johnson was born, he and his mother lived with Faulkner. Johnson's mother did not take care of his basic needs and continued abusing drugs. Faulkner eventually kicked Johnson's mother out of her house, but kept Johnson. She received custody of Johnson and his brother when her daughter was sent to prison. Upon release, the mother got temporary custody of the two boys, but did not take care of them. Faulkner returned to court to get custody. She described the time Johnson spent with his foster mother as being positive.
According to Faulkner, even as a child, Johnson had a difficult time paying attention in school and was placed in a special class after Faulkner retained an attorney to ensure that Johnson received an appropriate education.
She claimed that Johnson began to "fall apart" at thirteen. He began getting in trouble for theft, was rebellious, and refused to follow rules. Johnson also spent time at Hillcrest School by order of the juvenile court. His grades were good while he was there. Johnson also was placed with the Department of Youth Services. When he returned home, Johnson began to associate with a group that got him into trouble. Faulkner had no idea who Johnson's friends were and saw little of him after he quit school and moved out of her house.
Johnson returned to Faulkner's house with his pregnant girlfriend and lived there after the baby was born. Faulkner reported that he was a good father. She stated that Johnson never had an effective mother and was constantly disappointed when his mother broke promises to him. She stated that Johnson's father was also a drug addict who was frequently incarcerated.
Faulkner testified that, at one point, she had asked a counselor why Johnson was so mean to her and his great-grandmother, who also lived with Faulkner. The counselor told her that Johnson was mean to them because he was unable to get what he needed from his mother, so he "t[ook] it out on them." She stated that she loved Johnson unconditionally and pleaded for his life.
Dr. Hawkins testified that he was asked to examine Johnson for the "presence of mental illness" and "for any mitigating factors." He stated that he reviewed several inches of records, interviewed Johnson, and had an associate administer psychological tests. Included in the records he reviewed, which were admitted as exhibits during the mitigation phase, were Johnson's medical records from a pediatrician; hospital records relating to his birth; a juvenile court social-history report; a psychological report from the juvenile court that included a fairly comprehensive family history; a summary of institutional adjustment from Hillcrest School; a Hillcrest School assessment treatment and aftercare plan that included progress reports, school records from kindergarten to high school, his juvenile court record, and the Hamilton County Department of Human Services record of contacts with Johnson's mother, his maternal grandmother, the schools, Johnson's foster parents, and Johnson and his siblings.
The evidence included references that Faulkner was frequently drunk and was abusive to Johnson's mother; that Johnson's mother failed from his birth to provide him with attention; that Johnson's mother abused drugs and was unwilling to care for her children; that unsubstantiated reports of physical abuse inflicted on Johnson and his brother by Faulkner or her husband were made by a neighbor and by a friend; that Faulkner engaged in "carefree living"; and that she had numerous boyfriends and rejected Johnson's mother. The report also contained evidence of Johnson's need for structured environment at early age, and of Faulkner's frustration with Johnson's and his brother's behavior and with her inability to control them. The evidence also indicated that Johnson was "shuffled" among Faulkner, his mother, and foster families.
Dr. Hawkins reported that Johnson's family was "someplace between terrible and chaotic." He reported that Johnson's mother was heavily abusing drugs during her pregnancy and Johnson's birth, that she had never functioned as a mother, and that her presence in Johnson's life, when it occurred, created problems. He reported that Johnson's father, a drug abuser, was a non-entity in Johnson's life.
Hawkins did not interview Faulkner, but determined from the material that he reviewed that she had tried to help Johnson by identifying problems and making referrals for help. He stated, "I do not believe that she had any kind of psychiatric problems or any kind of drug or alcohol problems. I think she was the most stable factor in his life." He stated that Johnson's friends were involved in drugs, alcohol, and crime. He believed that Faulkner's husband had a drinking problem. He concluded that, in the environment in which Johnson was raised, right and wrong were not enforced. The environment included no male role model, negative peer pressure, no supervision, and involvement in "gang-type" behavior when Johnson was younger. According to Dr. Hawkins, Johnson had help from Faulkner, probation officers, two therapists, a Big Brother, and teachers who took an interest in him.
Johnson abused multiple drugs, used marijuana and hashish on a regular basis, and had a history of alcohol abuse. His drug use started at the age of twelve, causing behavior to generate money to buy drugs, and making it difficult to hold down a job and to attend to his daily life. He was diagnosed at eight as having attention deficit disorder and was prescribed Ritalin, but he was not responsive to treatment. According to Dr. Hawkins, Johnson's self-image was based on how he "con[ned]" the world. Dr. Hawkins also testified that Johnson failed less restrictive attempts to control his behavior, although he would do well originally.
Testing demonstrated that Johnson had low-average intelligence and failed to indicate any organic brain injury. Dr. Hawkins diagnosed Johnson as a chronic drug abuser and as having an antisocial personality disorder. According to the psychiatrist, Johnson had a disregard for and violated the rights of others. Dr. Hawkins explained that the criteria for an antisocial personality included a history of arrest, lying, compulsive behavior, fighting, disregard for safety, irresponsibility, an inability to hold a job, a lack of remorse, and a history of conduct disorder, all of which Johnson had. The psychiatrist testified that the disorder constituted a mental illness.
According to Dr. Hawkins, it was generally unknown how an antisocial personality disorder developed. He testified, "Nobody knows whether they're born that way, if it's genetic, environmental, drug abuse, whether it's maternal intellect. Nobody knows. There are an equal number of papers out there that will argue both sides. So nobody knows."
Dr. Hawkins determined that Johnson had an inflated opinion of himself and a history of blaming others, that Marks's murder was a voluntary act by Johnson, and that while drugs had reduced Johnson's inhibitions, they did not cause him to commit the murder. He further testified that Johnson had expressed no regret about the murder, only about his incarceration.
 Outside Evidence Was Cumulative, or Not Cogent, or Failed to Set Forth Sufficient Operative Facts
A review of the evidence presented by Johnson, when considered against the evidence presented at the mitigation hearing, fails to demonstrate that trial counsel was ineffective. Most of Johnson's evidence outside the record consists of affidavits of experts and family members and friends who reiterated the fact that Johnson abused alcohol and drugs, that he had a dysfunctional family life, as did his mother, that his mother abused drugs, that he experienced problems from an early age, and that he did poorly in school. Most of the additional evidence was cumulative and could be found in some form either in the testimony or in the documents admitted at the mitigation hearing. While the mitigation evidence indicated that Faulkner was the only stable influence in Johnson's life, the documents admitted at trial indicated that she inadequately parented Johnson's mother, abused alcohol, and had a less than stellar life. Thus, Johnson's postconviction evidence fails to materially advance his claim of ineffective assistance.
While the fact that Faulkner allegedly physically abused Johnson was not placed into evidence, Johnson has not demonstrated that counsel was ineffective for failing to present the evidence. Johnson's counsel presented a meaningful concept of mitigation despite the lack of evidence regarding Faulkner's alleged physical abuse of Johnson.
The record belies Johnson's assertion that because his mitigation experts did not have enough time to meaningful prepare for the mitigation hearing, he was denied effective assistance. The record demonstrates that counsel provided a competent and meaningful mitigation theory; thus, resort to evidence outside the record does nothing to materially advance a claim of ineffective assistance in this respect.
Johnson also claims that trial counsel was ineffective for failing to place into evidence the fact that he did well in structured environments. We are not persuaded that the evidence submitted outside the record on this issue demonstrates that Johnson was prejudiced by such a failure.[20] Further, to the extent that Johnson argues that the evidence outside the record was necessary to demonstrate to the jury why he developed an antisocial personality disorder, Dr. Hawkins testified that no one knew the cause of such a mental illness, and this is not contradicted by the evidence outside the record. (Dr. Pearson, we note, averred that the disorder had both genetic and environmental influences.)
In his eleventh claim for relief, Johnson contended that he was denied effective assistance during the penalty phase of his trial because counsel did not object to the re-admittance of the tape containing the 911 call made by Marks's husband when he discovered her body. In support of this claim, Johnson provided the affidavit of a juror who stated that the jury listened to the tape during mitigation deliberations, and that the tape was "horrific and very emotional." Consideration of the juror's affidavit is prohibited by Evid.R. 606(B). Thus, Johnson has failed to provide cogent evidence outside the record to support this claim. Moreover, because the claimed error could have been determined on the record without resort to the additional evidence, it is subject to the bar of res judicata.
 B. Guilt Phase
In his ninth claim for relief, Johnson asserted that he was denied effective assistance throughout his trial because defense counsel failed to fully investigate the existence of a person named Dante or Donte, who, Johnson claims, was at the crime scene with him. Johnson had stated to the police that "Dante," an older student with whom Johnson had attended Withrow High School, was involved in the killing of Marks.
In support of his claim, Johnson submitted his own affidavit, which offered a more precise description of the person and indicated that his nickname was "Tay." He also submitted the affidavit of a postconviction investigator who stated that he had discovered the existence of a black male who matched Johnson's description, named Donte Black and known as "Tay," who had attended high school with Johnson. Johnson also submitted the affidavit of the investigator used at trial. In that affidavit, the investigator stated that the defense team did not contact him until a week or so before trial. Johnson also submitted the affidavit of a cellmate who stated that Johnson had told him that Johnson and Donte had entered the Marks's home to find money for drugs, that Donte killed Marks, that three county prosecutors and detectives met with the cellmate and told him to testify that Johnson committed the murder and why, and that, at a subsequent meeting with a detective, the detective said that Donte was just a smokescreen. But the record demonstrates that counsel did attempt to find a Donte or Dante for Johnson's trial, but were unsuccessful. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[21]
The evidence outside the record fails to set forth sufficient operative facts to establish substantive grounds for relief.
In his nineteenth, twentieth, and twenty-first claims for relief, Johnson contended that the trial court's jury instructions on burden of proof and the terms "purposely" and "reasonable doubt" were erroneous, and that he was denied effective assistance because trial counsel did not object to the instructions. In support of these claims, Johnson submitted the affidavit of an attorney experienced and qualified in capital appellate practice. The affidavit stated why the attorney believed the instructions were wrong, that counsel was ineffective for not objecting, and how the instructions could have prejudiced Johnson.
The affidavit failed to provide material facts outside the record to demonstrate why Johnson's claims could not have been brought on direct appeal. Whether the instructions were erroneous as a matter of law and whether trial counsel was ineffective for failing to object were matters that could have been determined from the original trial record, without resort to evidence outside the record. These claims are, accordingly, barred by res judicata.
In his twenty-fifth claim for relief, Johnson contended that trial counsel was ineffective for failing to move to suppress his statements to the police, because the statements were a result of coercion. In support of this claim, he supplied his own affidavit, as well as the affidavits of his girlfriend and his brother. Johnson's girlfriend stated that the police told her that they would take her baby away if she did not tell the truth about Johnson. Johnson's brother stated that Johnson's girlfriend had told him that the police had told her that they would take her baby if she did not tell them something incriminatory about Johnson. Johnson's affidavit stated that the police threatened that he would lose his child if he did not say what the police wanted to hear.
The record demonstrates that trial counsel did move to suppress Johnson's statements, but on a different factual basis. Our review of the submitted evidence fails to reveal that trial counsel was informed of the threats. No facts appear in the record or in the submitted affidavits to show that counsel knew or should have known of the alleged threats. Thus, we conclude that Johnson has failed to set forth sufficient operative facts to support this claim of ineffective assistance.
 V. Judicial Bias
In his tenth claim for relief, Johnson alleged that his trial was tainted by judicial bias. To support this claim, he provided the affidavit of a juror, who stated that the trial court made faces during cross-examination of the state's witnesses, and that such expressions seemed to confirm the juror's feeling that the defense's argument "wasn't going anywhere." Johnson attempted to show that the juror was influenced by the bias of the trial court in favor of the prosecution. But Evid.R. 606(B) requires evidence other than a juror's affidavit to make that showing,[22] and such evidence was not submitted by Johnson.
Further, Evid.R. 606(B) prohibits a juror from testifying "to the effect of anything upon his * * * mind or emotions as influencing him to assent to * * * the verdict * * * concerning his mental processes in connection therewith."[23] The juror's statement that the trial court's conduct affected his assessment of Johnson's defense, and implicitly his decision to join in the verdict of guilty, violated this rule.[24] Johnson thus failed to present appropriate evidence to support his claim of ineffective assistance in this respect.
 VI. Selection of Grand Jury Foreperson
In his twelfth claim for relief, Johnson contended that Hamilton County's procedure for selecting the forepersons of grand juries that returned capital indictments was geographically, racially, culturally, and socio-economically biased. He alleged that the selection process violated his equal-protection and due-process rights under the United States Constitution and the fair-cross-section requirement of theSixth Amendment. His submitted evidence consisted of the deposition of a Hamilton County common pleas judge explaining that the jury foreperson was selected by the administrative judge and the June 1998 affidavit of a criminal investigator, in which the investigator provided the names, addresses, and races of twenty-one persons identified as forepersons of grand juries that had returned capital indictments. All who could be contacted were Caucasian, and allegedly the majority was from the northwestern section of the county. Johnson also supplied a list of grand jurors and the jury forepersons for the period from 1985 through 1990, along with addresses for each. The submitted evidence was in existence and available to Johnson at the time of trial and could have been submitted to the trial court if Johnson had wanted to challenge the selection process for grand-jury forepersons in Hamilton County. This claim is one that could have been raised at trial and is, thus, barred byres judicata.[25]
 VII. Overprosecution of Capital Cases
In his thirteenth claim for relief, Johnson contended that Hamilton County overprosecuted capital cases, which resulted in the arbitrary and capricious imposition of the death penalty and was violative of Johnson's equal-protection rights. In support of this claim, he provided statistical evidence showing that Hamilton County outpaced other Ohio counties in seeking death-penalty indictments and obtaining death-penalty convictions. This evidence was available at the time of trial, and the claim could have been raised at that time. To the extent that it raised a constitutional challenge, it is barred by the doctrine of resjudicata.
 VIII. Jury Instructions
In his eighteenth claim for relief, Johnson alleged that the instructions given to capital juries were overly broad and biased against defendants, and allowed the juries to consider nonstatutory aggravating factors. He submitted as evidence to support the claim the affidavit of a professor of linguistics. Because this issue could have effectively been raised at the original trial and argued on direct appeal, it is barred by res judicata.
 IX. Constitutionality of the Death Penalty
In his twenty-ninth and thirtieth claims for relief, Johnson challenged the constitutionality of death by electrocution and by lethal injection. He supplied as supporting evidence various articles, deposition transcripts, newspaper reports, drawings, law review publications, photographs, and postmortem-examination reports. The Ohio Supreme Court has determined that electrocution by the state does not constitute cruel and unusual punishment,[26] and we are bound by that holding. And although the court has not yet ruled on the constitutionality of lethal injection, R.C. 2949.22 allows a condemned person to choose between lethal injection and electrocution. Thus, whether lethal injection is a cruel and unusual punishment need not be decided here, because we are "bound by Ohio law to find that one of the means of death which can be elected by a defendant is constitutional."[27] This claim has no merit.
 X. Cumulative Error
In his thirty-first claim for relief, Johnson asserted that his conviction was void or voidable because of cumulative errors. Given our rulings rejecting Johnson's other claims for relief, we conclude that the trial court properly dismissed this claim.
 XI. Second Assignment-Inadequacy of Postconviction Proceedings
In Johnson's second assignment, he argues that the postconviction statutes fail to afford an adequate corrective process and do not comply with due-process and equal-protection guarantees. Particularly, Johnson challenges the lack of access to traditional discovery mechanisms. This court has held that the failure to afford a petitioner discovery in the initial stage of postconviction proceedings to determine whether he is, in fact, entitled to an evidentiary hearing is not unconstitutional.[28]
 XII. Third Assignment-Cumulative Error
In his third assignment, Johnson asserts that the cumulative errors reflected in his various postconviction claims merit reversal for a proper postconviction hearing. We overrule this assignment based on our disposition of Johnson's first and second assignments.
We affirm the trial court's judgment.
Gorman, P.J., and Winkler, J., concur.
[1] See State v. Johnson (2000), 88 Ohio St.3d 95, 723 N.E.2d 1054, certiorari denied (2000), ___ U.S.__, 121 S.Ct. 2121.
[2] R.C. 2953.21(A).
[3] See State v. Calhoun (1999), 86 Ohio St.3d 279, 714 N.E.2d 905,907, paragraph two of the syllabus.
[4] R.C. 2953.21(C).
[5] R.C. 2953.21(G).
[6] See State v. Fears (Nov. 12, 1999), Hamilton App. No. C-990050, unreported, citing State v. Perry (1967), 10 Ohio St.2d 175,226 N.E.2d 104, paragraph nine of the syllabus.
[7] See State v. Coleman (Mar. 17, 1993), Hamilton App. No. C-900811, unreported.
[8] See State v. Fears, supra, quoting State v. Coleman, supra.
[9] See State v. Fears, supra, citing State v. Combs (1994),100 Ohio App.3d 90, 98, 652 N.E.2d 205, 212.
[10] See State v. Coleman, supra.
[11] See State v. Calhoun at 285, 714 N.E.2d at 911-912.
[12] See id. at 284, 714 N.E.2d at 911.
[13] See State v. Cole (1982), 2 Ohio St.3d 112, 114, 443 N.E.2d 169,171.
[14] See State v. White (1999), 85 Ohio St.3d 433, 450, 709 N.E.2d 140,157, certiorari denied (1999), ___ U.S. ___, 120 S.Ct. 345, citingStrickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052,2064.
[15] See id., citing Strickland v. Washington at 690-691,104 S.Ct. at 2066.
[16] See id., quoting Strickland v. Washington at 694,104 S.Ct. at 2068.
[17] See State v. Thompson (1987), 33 Ohio St.3d 1, 10, 514 N.E.2d 407,417.
[18] See State v. Coulter (1992), 75 Ohio App.3d 219, 230,598 N.E.2d 1324, 1331.
[19] See State v. Combs at 104, 652 N.E.2d at 214.
[20] See, e.g., State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported.
[21] See Strickland v. Washington at 690-691, 104 S.Ct. at 2066.
[22] See State v. Storer (Apr. 10, 1991), Clark App. No. 2671, unreported.
[23] See id, quoting Evid.R. 606(B).
[24] See id.
[25] Accord State v. Campbell (Jan. 8, 1997), Hamilton App. No. C-950746, unreported.
[26] See State v. Coleman (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622,633.
[27] See State v. Vrabel (Mar. 2, 2000), Mahoning App. No. 95 CA 221, unreported; State v. Joseph (July 17, 1997), Allen App. No. 1-96-90, unreported.
[28] See State v. Campbell, supra. See, also, State v. La Mar
(Mar. 17, 2000), Lawrence App. No. 98 CA 23, unreported.