**[Cite as *State v. Rivers*, 2020-Ohio-3492.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-19-1040

      Appellee                            Trial Court No. CR0201801882

v.

 Lonzo Rivers                              **DECISION AND JUDGMENT**

      Appellant                            Decided:  June 26, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Thomas P. Kurt, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

**{¶ 1}** Appellant, Lonzo Rivers, appeals the judgment of the Lucas County Court of

Common Pleas, sentencing him to an indefinite prison term of 18 years to life after a jury

found him guilty of one count of murder with an attendant firearm specification.

## A. Facts and Procedural Background

{¶ 2} On May 14, 2018, appellant, along with several codefendants (Brandon Stein, Daniel Matney, and Mark Diebert), was indicted on one count of aggravated murder in violation of R.C. 2903.01(B) and (F), an unclassified felony, one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified felony, one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), a felony of the first degree, and one count of kidnapping in violation of R.C. 2905.01(B)(2) and (C), a felony of the first degree. Firearm specifications were also attached to each of the foregoing counts. These charges stemmed from a fatal shooting that took place on November 20, 2017, at a Stop & Go gas station located at the corner of South and Spencer streets in South Toledo.

{¶ 3} Appellant entered a plea of not guilty to the aforementioned charges, and discovery commenced. Upon completion of discovery, on February 4, 2019, the matter proceeded to a five-day jury trial. Despite the state's indictment charging Stein, Matney, and Diebert, appellant was tried alone.

{¶ 4} At trial, the state called six witnesses. For its first witness, the state called Toledo Police officer Mark Johnson. Johnson works within the video unit of the Toledo Police Department, where he recovers and preserves surveillance video from crime scenes. Relevant to this matter, Johnson recovered a video from the Stop & Go gas station's surveillance system, which depicts the shooting. After its authentication, the surveillance video was admitted into evidence and published to the jury.

2.

{¶ 5} The video shows a man, later identified as appellant, placing an envelope underneath a 55-gallon trash receptacle. Thereafter, the victim in this case, Dakoda Rogers, approached the trash receptacle in his vehicle. At that point, Stein, Matney, and Diebert, each in separate vehicles, drove up to Rogers and boxed him in with their vehicles. Appellant then walked up to Rogers, who remained in his vehicle, and confronted him. During the confrontation, appellant fired two shots into Rogers' vehicle at close range. Rogers attempted to drive away, but crashed his vehicle as he attempted to do so, later succumbing to his gunshot injuries.

{¶ 6} As its second witness, the state called Toledo Police patrolman Anthony Waldon. On the date of the shooting, Waldon received a call from dispatch reporting shots fired at the location of the Stop & Go gas station. Waldon and his partner, Benjamin Woody, responded to the scene, where they observed a vehicle that had crashed nearby. Waldon and Woody approached the vehicle and noticed that Rogers was non-responsive and was presenting with shallow breathing. Waldon proceeded to shatter the driver's side window in order to access the passenger compartment so that the officers could extract Rogers from the vehicle. After extracting Rogers, Waldon turned him over to the Toledo Fire Department personnel that were on the scene, and began to discuss the shooting with nearby witnesses.

{¶ 7} For its third witness, the state called Toledo Police detective Richard Fisher. After arriving at the scene of the shooting, Fisher was dispatched to the University of

3.

Toledo Medical Center. Fisher was present at the hospital when Rogers was pronounced dead, and he testified that he was also present when Rogers' family identified Rogers.

{¶ 8} Next, the state called Toledo Police officer Jeff Jackson as its fourth witness. As an officer in the scientific investigations unit, Jackson responds to, and collects evidence from, crime scenes. Jackson responded to the scene of the shooting in this case, where he gathered evidence including two shell casings, a bank envelope with "magazine-type paper" inside, and photographs of the area. The photographs were admitted into evidence, authenticated by Jackson, and published to the jury. Later in his testimony, Jackson indicated that he attended the autopsy that was performed on Rogers. During the autopsy, the coroner's office recovered two bullets, which were subsequently taken into evidence and introduced at trial.

{¶ 9} As its fifth witness, the state called Kelsey Rogers. Kelsey is Rogers' older sister. Kelsey testified as to an "on-and-off relationship" that existed between Rogers and another young man, D.N. Prior to the shooting, Rogers asked Kelsey if he could borrow her phone. Kelsey agreed, and Rogers left Kelsey's house at 1:30 p.m. on the afternoon of the shooting. Kelsey's phone was later recovered by police from the scene of the shooting.

{¶ 10} Finally, for its sixth witness, the state called Toledo Police homicide detective Jeffery Clark. On November 20, 2017, Clark was dispatched to the scene of the shooting after receiving a report of a possible homicide. After arriving at the scene, Clark began to interview witnesses and collect evidence. Subsequently, Clark reviewed

4.

the surveillance video that was recovered from the Stop & Go gas station, which allowed him to ascertain the details of the shooting and identify the vehicles that were driven by Stein, Matney, and Diebert.

{¶ 11} Clark also conducted a search of Kelsey's phone and found text messages to and from appellant's phone contained therein. The messages revealed an extortion scheme orchestrated by Rogers, who demanded that appellant pay him a sum of money in exchange for a DVD that allegedly contained a sexually explicit video involving appellant.[1] In these messages, appellant informed Rogers that they would meet at the Stop & Go gas station, and Rogers instructed appellant to place a money envelope underneath a "blue garbage can." Rogers stated that he would then retrieve the money envelope and place the DVD in its place.

{¶ 12} After Clark testified as to his findings regarding the shooting, the state began questioning him about his investigation into appellant's prior communications with the Toledo Police Department. According to Clark, appellant filed a report with police at the Safety Building in downtown Toledo regarding Rogers' extortion attempt four hours prior to the shooting. Immediately thereafter, appellant drove to the Scott Park police station to file another report.

{¶ 13} Clark investigated appellant's claim that he had verbally reported the extortion plot to Toledo Police officers two days prior to the shooting. Appellant claimed

---

[1] Clark recovered a DVD from Rogers' vehicle, but the disc did not contain any sexually explicit material.

5.

that he spoke with these officers at a Speedway gas station on the corner of Arlington and North Detroit in Toledo. Consequently, Clark was able to identify the officers that would have been on duty in that area at the time of appellant's reported conversation. Clark discussed the matter with the identified officers, none of which were able to recall speaking with appellant about the extortion plot. However, Clark was able to verify that appellant placed an eight minute phone call to the Toledo Police non-emergency line on November 17, 2017, three days prior to shooting.

{¶ 14} Toward the end of Clark's testimony, appellant called Stein, Matney, and Diebert out of order. Each of these witnesses asserted their Fifth Amendment right and elected not to testify. Thereafter, the state recalled Clark for brief follow-up questioning.

{¶ 15} At the conclusion of Clark's testimony, the state rested. Appellant moved for an acquittal under Crim.R. 29, which was denied by the trial court. Thereafter, appellant elected to take the stand.

{¶ 16} For his part, appellant testified that he began receiving text messages from an unknown number approximately one week before the shooting occurred. According to appellant, the text messages included an image of the lower half of what appeared to be a man's body. Appellant informed the sender that he or she had the wrong number, but the sender insisted that the number was correct, and accused appellant of "mess[ing] around with their baby daddy." The sender also indicated that appellant's sexual activity was secretly recorded.

6.

{¶ 17} Eventually, the sender began to demand payment from appellant. In response, appellant called the non-emergency number to the Toledo Police Department on Friday, November 17, 2017, to report the extortion plot. Appellant spoke to detective Roque Brown, who asked him a series of questions about whether or not there was a sexually-explicit video of appellant. Appellant indicated that there was no such video, and the conversation ended with Brown telling appellant to disregard the messages.

{¶ 18} Appellant testified that the text messages continued following his discussion with Brown. The topic of payment was prominent in the messages, with the sender demanding $5,000 in exchange for the video and threatening to release the video on Facebook if the payment was not made. Appellant informed the sender that he had $800, and later agreed to meet the sender at 3176 Douglas Road in Toledo, in order to make the $800 payment in exchange for the video. Appellant traveled to that address, placed the money in the mailbox, and then parked at a nearby pharmacy where he could observe the mailbox in order to ascertain the identity of the sender of the text messages.

{¶ 19} Eventually, appellant observed the driver of a sedan pull up to the mailbox and retrieve the money. Appellant followed the sedan for a short time, but mechanical issues with his vehicle prevented him from continuing. Appellant returned to the mailbox to retrieve the video, only to find the mailbox empty.

{¶ 20} The following day, Saturday, November 18, 2017, appellant received a message from the sender demanding an additional payment of $1,300. Appellant indicated his agreement to pay the additional amount, but testified at trial that he never

7.

intended to actually make the payment. Appellant was once again instructed to place the money into the mailbox at 3176 Douglas Road. He traveled to the address and parked at a church located across the street from the mailbox.

{¶ 21} After observing the mailbox for about 45 minutes, appellant decided to leave. As appellant was exiting the church, he observed another vehicle pass by in the direction of another parking lot exit. Appellant noticed that it was the same sedan he had previously observed, and he gave chase. During the ensuing chase, appellant noted the license plate number associated with the sedan, recording it in his mobile phone. Appellant called 911 and reported the situation, but was told by the dispatcher to cease the chase. Appellant complied with the instruction, and the chase ended.

{¶ 22} Thereafter, the text messages continued, with the sender informing appellant that the sender would "put some people on" appellant. Appellant testified at trial that he considered this to be a threatening statement.

{¶ 23} Appellant returned to 3176 Douglas Road and knocked on the door. After receiving no response, appellant removed some mail from the mailbox in order to ascertain the identity of the person living at that address. Appellant then decided to drive home.

{¶ 24} As he was arriving home, appellant saw a Toledo Police cruiser parked at a nearby Speedway gas station. Appellant approached the cruiser and explained the extortion plot to the police officer. Appellant provided the officer with the 3176 Douglas Road address, the name contained on the mail he retrieved from that address, the sender's

8.

phone number, and the license plate of the sedan that he had recorded in his mobile phone. The officer performed a check of the information, but no identifying information was recovered. Thereafter, the police officer suggested that appellant file a report at the Toledo Safety Building.

{¶ 25} On Sunday, November 19, 2017, appellant received further messages from sender, demanding payment and threatening publication of the video on Facebook. Appellant agreed to make payment, and a meeting was scheduled for the following day.

{¶ 26} On the morning of the scheduled meeting, appellant filed a report detailing the extortion plot at the Toledo Safety Building. While there, appellant requested to speak with a detective, but was informed that he would not be permitted to do so at that time. Frustrated, appellant left the Toledo Safety Building and traveled to the Scott Park office of the Toledo Police department to speak with someone about the extortion plot. Appellant was provided with a number of a Toledo police officer whom he was instructed to call. After leaving a voice mail at that number, appellant received a call back and was informed by the officer that he would be unable to help appellant.

{¶ 27} Appellant eventually made his way to Diebert's home, where he discussed the extortion plot with Diebert and Stein. Matney was also present during the discussion.

{¶ 28} While at Diebert's home, sender contacted appellant to set up a meeting place at which the money and video could be exchanged. Appellant selected the nearby Stop & Go gas station as a meeting place. Sender agreed to meet appellant at the gas station, and directed appellant to place the money under a garbage can located on the

9.

premises, go into the service station, and then wait for the sender to exit to return to the garbage can, where he could retrieve the video.

{¶ 29} Appellant, armed with a loaded handgun and assisted by Diebert, Stein, and Matney, traveled to the Stop & Go gas station. Thereafter, appellant placed a money envelope under the garbage can, and began to walk into the service station. According to appellant, he heard someone shout his name, turned around, and saw the sedan driven by Rogers. Appellant approached the sedan to confront Rogers. While doing so, appellant allegedly perceived Rogers making a move toward the floorboard of his vehicle, which was interpreted by appellant as Rogers reaching for a firearm. In response, appellant drew his handgun and fired two shots into the passenger compartment of Rogers' vehicle, ultimately resulting in Rogers' death.

{¶ 30} During his testimony, appellant asserted that he had not discussed a plan to trap Rogers with Diebert, Stein, and Matney prior to the shooting. Rather, appellant claimed that he enlisted the assistance of Diebert, Stein, and Matney because he was fearful of what he might encounter at the Stop & Go gas station. Appellant acknowledged that he was the shooter depicted in the surveillance video, but insisted that he fired his handgun in self-defense, fearing that Rogers was reaching for a firearm prior to shooting.[2]

_____

[2] No firearm was recovered from Rogers' vehicle.

10.

{¶ 31} Following appellant's testimony, defense counsel rested. The parties then provided their closing statements, and the jury was instructed. After deliberating, the jury found appellant guilty of one count of murder with an attendant firearm specification, but not guilty of the remaining counts contained in the indictment. After receiving the jury's verdict, the trial court continued the matter for sentencing.

{¶ 32} At sentencing, the trial court ordered appellant to serve an indefinite prison sentence of 15 years to life for murder, plus another mandatory prison sentence of three years for the attendant firearm specification, for a total prison sentence of 18 years to life. Thereafter, appellant filed his timely notice of appeal.

### B. Assignments of Error

{¶ 33} On appeal, appellant assigns the following errors for our review:

I. The judgment of the trial court is against the manifest weight of the evidence, in that the evidence clearly established that appellant Lonzo Rivers acted in self-defense.

II. The trial court erred in trying the case of appellant Lonzo Rivers alone and without his co-defendants, where neither the defendant nor the State of Ohio requested a severance, in violation of Ohio Revised Code § 2945.13.

III. Appellant was denied effective assistance of counsel, in violation of his right to counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 10 of the Ohio Constitution, by

counsel's failure to seek a continuance of the trial date to on or after the effective date of the amendment to Ohio Revised Code § 2901.05, which now places the burden of proof with respect to self-defense on the State of Ohio.

## II. Analysis

### A. Manifest Weight

{¶ 34} In his first assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence.

{¶ 35} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 36} Here, appellant was convicted of murder in violation of R.C. 2903.02(B), which provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

12.

{¶ 37} Appellant concedes that he shot and killed Rogers, as is clearly depicted in the surveillance video that is part of the record in this case. Unquestionably, this conduct satisfies the elements of murder outlined above. However, appellant argues that the jury should have found him not guilty of murder based upon his claim of self-defense.

{¶ 38} In support of his self-defense claim, appellant contends that he "was reasonably in fear of his safety and his life when * * * Rogers made a move in his vehicle which strongly suggested reaching for a weapon." Appellant goes on to assert that Rogers caused him to be "in a state of anxiety and fear for fully one week, incessantly needling him with threats and demands."

{¶ 39} In order to prevail on his claim of self-defense, appellant must establish that he was not at fault in creating the situation that led to the shooting. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. "An individual who is the first aggressor in an incident is 'at fault' for purposes of self-defense." *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 9, citing *State v. Turner*, 171 Ohio App.3d 82, 2007-Ohio-1346, 869 N.E.2d 708, ¶ 23 (2d Dist.).

{¶ 40} In our review of the surveillance footage of the shooting, we find that appellant's claim of self-defense is untenable. In particular, the coordinated movement of Diebert, Stein, and Matney, resulting in the boxing in of Rogers' vehicle at the same time as appellant approached Rogers with a loaded handgun, establishes that the four men planned to confront Rogers at the Stop & Go gas station. Given these facts, it is clear that appellant, not Rogers, was the aggressor in this incident. Consequently, appellant's

13.

self-defense claim must fail, regardless of any furtive movements that Rogers may have made prior to the shooting.

{¶ 41} Moreover, we observe that appellant's claim of self-defense was fully explored by the parties at trial. Appellant testified that he was fearful prior to the shooting, which prompted the state's thorough cross-examination on the issue of self-defense.

{¶ 42} In short, the jury considered all of the evidence and chose not to credit appellant's self-serving testimony, which was contradicted by the video evidence introduced by the state. Having examined the evidence ourselves, we find that the jury did not lose its way or create a manifest miscarriage of justice in finding appellant guilty of murder. Accordingly, we reject appellant's manifest weight argument and find his first assignment of error not well-taken.

## B. Severance of Co-Defendants

{¶ 43} In his second assignment of error, appellant argues that the trial court erred under R.C. 2945.13 in severing his trial from the trial of Diebert, Stein, and Matney.

{¶ 44} R.C. 2945.13 provides: "When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."

**{¶ 45}** In the proceedings below, appellant did not complain of the severance of his trial from that of Diebert, Stein, and Matney. Having failed to previously raise this issue, appellant has forfeited all but plain error. *State v. Moss*, 6th Dist. Lucas No. L-19-1047, 2020-Ohio-2862, ¶ 36, citing *State v. McClain*, 6th Dist. Lucas No. L-10-1088, 2012-Ohio-5264, ¶ 12. In order to demonstrate plain error, appellant must show that, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. McKee*, 91 Ohio St.3d 292, 294, 744 N.E.2d 737 (2001), citing Crim.R. 52(B); *State v. Johnson*, 88 Ohio St.3d 95, 111, 723 N.E.2d 1054 (2000).

**{¶ 46}** In his brief, appellant summarily claims that his conviction should be considered void because he was not tried together with Diebert, Stein, and Matney. Appellant does not claim, and offers no argument to demonstrate, that the trial court's decision to try him alone had any bearing on the outcome of the trial. As such, appellant has failed to demonstrate plain error with respect to the trial court's severance of his trial from that of Diebert, Stein, and Matney.

**{¶ 47}** Accordingly, appellant's second assignment of error is not well-taken.

### C. Ineffective Assistance of Counsel

**{¶ 48}** In appellant's third assignment of error, he argues that he received ineffective assistance of counsel. When reviewing a claim of ineffective assistance of counsel, we apply the following standard:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the

defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 49} Here, appellant asserts that his trial counsel was ineffective for failing to seek an eight-week continuance of the trial until after March 28, 2019, the effective date of an amendment to R.C. 2901.05(B)(1), which now provides that the prosecution has the burden to prove beyond a reasonable doubt that the accused did not act in self-defense where there is evidence presented that tends to support a self-defense claim. Appellant argues that this change would have benefitted him in a case in which "[t]he question of self-defense was close at best; had the burden as to self-defense been on the State * * * there is a very high probability that Mr. Rivers would have been acquitted."

{¶ 50} In response, the state argues that appellant has not demonstrated incompetence on the part of his defense counsel, nor prejudice as a result of the failure to seek a continuance. The state contends that the trial court would likely not have granted a request for a continuance solely on the basis of defense counsel's desire to reap the benefit of the amendment to R.C. 2901.05(B)(1). Further, the state argues that the outcome of the proceedings would not have been different had such a continuance been granted, because the evidence overwhelmingly negates appellant's self-defense claim.

16.

**{¶ 51}** In *U.S. v. Tanner*, 544 F.3d 793 (7th Cir.2008), the United States Court of Appeals for the Seventh Circuit examined a claim of ineffective assistance of counsel that was similarly premised upon trial counsel's failure to seek a continuance so that the defendant could obtain the benefit of an amendment to the federal sentencing guidelines. There, the court found that "[i]t is improper for a judge to grant (or deny) a continuance for the very purpose of changing the substantive law applicable to the case." *Id.* at 796. The court went on to explain:

> A sentencing judge cannot rightly say, "I do not like the current guidelines, so I am continuing the sentencing hearing in the hope and expectation (in this case, the certainty) that they will change." Or: "Ordinarily I would grant a continuance, but I won't do so in this case because I prefer the current guidelines to those about to take effect." * * * [T]he power to grant or deny a continuance is abused when it is exercised not in order to manage a proceeding efficiently but in order to change the substantive principles applicable to a case. That would be like the judge's trying to change the effective date of a statute because he liked, or disliked, how the statute had changed the existing law.

*Id.* at 796-797.

**{¶ 52}** Under the persuasive logic articulated in *Tanner*, we find that trial counsel's failure to request a continuance in this matter was not deficient. Indeed, such a request would have invited the trial court to commit error by granting a continuance, the

17.

sole purpose of which would have been to allow appellant to receive the benefit of a statutory amendment rather than to manage the proceeding efficiently.

{¶ 53} Moreover, we find that appellant cannot demonstrate that trial counsel's performance prejudiced him. As we already discussed in our analysis of appellant's first assignment of error, the evidence presented by the state in this case establishes that there is no merit to appellant's claim of self-defense. There is nothing in the record to demonstrate that Rogers was the initial aggressor in this incident. Consequently, even with the benefit of the amended language in R.C. 2901.05(B)(1), appellant's self-defense claim would fail, and the outcome of these proceedings would remain the same.

{¶ 54} Because appellant has not demonstrated that his defense counsel rendered deficient performance that altered the outcome of the proceedings below, we find his third assignment of error not well-taken.

### III. Conclusion

{¶ 55} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.         _____
                                                                     JUDGE

Arlene Singer, J.               

                                                              _____
Gene A. Zmuda, P.J.                                           JUDGE
CONCUR.

                                                                _____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.